MAJESTIC REALTY ASSOCIATES, INC., AND BOHEN'S, INC., PLAINTIFFS-RESPONDENTS, v. TOTI CONTRACT-ING CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT, AND PARKING AUTHOR-ITY OF THE CITY OF PATERSON, NEW JERSEY, DE-FENDANT-APPELLANT.

Argued June 5, 1959—Decided July 6, 1959.

Mr. *Joseph J. DeLuccia* argued the cause for plaintiffs-respondents (Mr. *Edward G. Weiss,* attorney).

Mr. *Irving C. Evers* argued the cause for defendant-appellant, Parking Authority of the City of Paterson (Mr. *George A. Vaccaro,* attorney).

The opinion of the court was delivered by

FRANCIS, J. Plaintiffs Majestic Realty Associates, Inc., and Bohen's, Inc., owner and tenant, sought compensation from defendants Toti Contracting Co., Inc. and Parking Authority of the City of Paterson, New Jersey, for damage to Majestic's building and to Bohen's goods. The claim arose out of the activity of Toti in demolishing certain structures owned by the Authority. In the trial court, the action against the Authority was dismissed at the close of the plaintiffs' proof on the ground that Toti was an independent contractor for whose negligence the Authority could not be held responsible. The issue of the contractor's liability was submitted to the jury, which returned substantial verdicts for both plaintiffs. Majestic and Bohen's appealed from the dismissal in favor of the Authority. Toti did not seek a review. The Appellate Division by a vote of two to one reversed and ordered a new trial. 54 *N. J. Super.* 419 (1959). The matter is now before us as of right for final determination. *R. R.* 1:2–1(*b*).

Majestic is the owner of the two-story premises at 297 Main Street, Paterson, New Jersey. Bohen's is the tenant of the first floor and basement thereof in which it conducted a dry goods business. The Authority acquired properties along Main Street beginning immediately adjacent to Majestic's building on the south and continuing to Ward Street, the next intersecting street, and then east on the latter street for 150 feet. The motive for the acquisition was to establish a public parking area. Main Street is one of the principal business arteries of the city and the locality was completely built up.

Accomplishment of the Authority's object required demolition of the several buildings on both streets. Some time prior to October 26, 1956, a contract was entered into by the Authority with Toti to do the work. The razing began on the Ward Street side and moved northwardly until the structure next to Majestic's premises was reached. It was at least a story (about 20 feet) higher than Majestic's roof;

the northerly wall of the one was "right up against" the southerly wall of the other and the two walls ran alongside each other for 40 feet.

In the process of leveling this adjacent building, the contractor first removed the roof, then the front and south sidewalls and all of the interior partitions and floors. Thus, the north wall of brick and masonry next to Majestic's structure was left standing free. Expert testimony was adduced to show that the proper method of demolition under the existing circumstances would have been to remove the roof, leaving the interior partition work for support, and to begin to take the north wall down "never leaving any portion [of it] at a higher point than the interior construction of the building would form a brace."

In demolishing the walls, Toti used a large metal ball, said to weigh 3,500 pounds, suspended from a crane which was stationed in the street. There was testimony that during the week prior to the accident, every time the ball would strike a wall, debris and dirt would fly and the Majestic building "rocked."

Further expert testimony indicated that in dealing with the free-standing north wall, the ball should have been made to hit the very top on each occasion so as to level it a few bricks at a time. This course was followed at first; the ball was swung from north to south and the dislodged bricks were catapulted away from Majestic's building and onto the adjoining lot. After a time, work ceased for a few minutes. On resumption, the operator of the crane swung the ball in such a manner that it struck at a point some 15 feet below the top of the wall. The impact propelled the uppermost section of the wall back in the direction from which the blow had come with the result that a 15 by 40 foot section fell on Majestic's roof, causing a 25 by 40 foot break therein. One of Bohen's employees, who saw the incident, asked the crane operator in the presence of Toti's president: "What did you do to our building?" He replied, "I goofed."

In characterizing a demolition undertaking of this type in a built up and busy section of a city, and in particular where one building to be razed adjoined another which was to remain untouched, plaintiffs' expert witness said it was "hazardous work"; "one of the most hazardous operations in the building business." And with reference to the leveling of a building so close to another structure which was not to be harmed, he asserted that the recognized procedure is to take it down in small sections so as not to lose control of the operation. This standard conforms with *N. J. S. A.* 34:5–15 which specifies that "[i]n the demolition of buildings, walls shall be removed part by part."

On the proof outlined, the trial court recognized that the work was hazardous in its very nature, but did not feel that it constituted a nuisance *per se*. Therefore, he ruled that the Authority, not having had or exercised control over the manner and method or means of performing the demolition operation, could not be held for the negligent act of its independent contractor. The majority of the Appellate Division took the position that where the activity contracted to be undertaken is such that potential danger exists regardless of reasonable care on the part of the contractor, the landowner cannot, by contractual delegation, immunize himself against liability for negligence of the contractor which causes injury to a member of the public or to an adjoining property owner. The dissent expressed the view that under the evidence the mishap resulted from a negligent failure to follow the standard procedure for the destruction of the wall and not from a danger which inhered in the work itself regardless of the exercise of care. Thus, it was declared that the contract protected the Authority against liability for Toti's negligence in the performance of the work. It remains for this court to search out the just rule to be applied in the circumstances.

■■ The problem must be approached with an awareness of the long settled doctrine that ordinarily where a person engages a contractor, who conducts an independent business

by means of his own employees, to do work not in itself a nuisance (as our cases put it), he is not liable for the negligent acts of the contractor in the performance of the contract. *Terranella v. Union Bldg. & Construction Co.,* 3 *N. J.* 443, 446, 447 (1950); *Mann v. Max,* 93 *N. J. L.* 191, 193, 21 *A. L. R.* 1227 (*E. & A.* 1919); *Cuff, Adm'x., v. Newark & New York R. R. Co.,* 35 *N. J. L.* 17 (*Sup. Ct.* 1870), affirmed 35 *N. J. L.* 574 (*E. & A.* 1871). Certain exceptions have come to be accepted, *i. e.,* (a) where the landowner retains control of the manner and means of the doing of the work which is the subject of the contract; (b) where he engages an incompetent contractor; or (c) where, as noted in the statement of the general rule, the activity contracted for constitutes a nuisance *per se. Terranella v. Union Bldg. & Construction Co., supra; Bergquist v. Penterman,* 46 *N. J. Super.* 74 (*App. Div.* 1957), certification denied 25 *N. J.* 55 (1957); *Trecartin v. Mahony-Troast Construction Co.,* 18 *N. J. Super.* 380 (*App. Div.* 1952).

■ In the present case, the suggestion is made that the language of the contract reveals a retention of control by the Authority of the method of Toti's performance sufficient to warrant the application of principles of *respondeat superior* in the interest of injured third persons. Our examination of the document convinces us otherwise. The plain import of the provisions is not to confer on the Authority the right to say how the job shall be done; the reservation is limited to supervision for the purpose of seeing that the work is done in accordance with the contract and specifications. The supervisory interest relates to the result to be accomplished, not to the means of accomplishing it. *Giroud v. Stryker Transportation Co.,* 104 *N. J. L.* 424 (*E. & A.* 1928); *Trecartin v. Mahony-Troast Construction Co., supra,* 18 *N. J. Super.* at *page* 386.

As to exception (b), noted above, it is not claimed that the proof makes out a jury question on the charge that an

incompetent contractor was hired for the task of demolition. Incidental comment thereon, however, may be fruitful.

It has been intimated that the matter of the competency of a contractor should not be restricted to considerations of skill and experience but should encompass financial responsibility to respond to tort claims as well. See 2 *Harper and James, The Law of Torts* (1956), § 26.11, *p.* 1405; *Prosser, Torts* (2d ed. 1955), *pp.* 357–358; *Morris, "Torts of Independent Contractors,"* 29 *Ill. L. Rev.* 339, 344 (1934); *Steffen, "Independent Contractor and the Good Life,"* 2 *Univ. of Chicago L. Rev.* 501, 505 (1935). Research has not disclosed a case where the proposal has been applied. The matter was broached in *Lawrence v. Shipman,* 39 *Conn.* 586 (*Sup. Ct. Err.* 1873), involving a claim arising out of the negligence of a masonry contractor. There, the court said:

"I am not prepared to say that this fact [financial irresponsibility of the contractor] may not be of some weight where the work to be done is hazardous to others. If a person having an interest in a job which naturally exposes others to peril, should attempt to shield himself from responsibility by contracting with a bankrupt mechanic, I think the employers might be subjected for damages done by the contractor, but, as before stated, the work to be done by the contractor involved no peril in its usual performance, and I cannot hold the defendants liable under this claim." At *page* 590. (Insertion ours)

▆ Inevitably the mind turns to the fact that the injured third party is entirely innocent and that the occasion for his injury arises out of the desire of the contractee to have certain activities performed. The injured has no control over or relation with the contractor. The contractee, true, has no control over the doing of the work and in that sense is also innocent of the wrongdoing; but he does have the power of selection, and in the application of concepts of distributive justice perhaps much can be said for the view that a loss arising out of the tortious conduct of a financially irresponsible contractor should fall on the contractee. Pro-

fessor Morris, in *"Torts of Independent Contractors,"* *supra,* put it this way:

"If the contractee has to look out for the interests of others by using due care to pick a man with requisite skill to whom to entrust his enterprises, why should he not also have to look out for the interests of others by selecting a man with sufficient financing? And since there is usually a fool proof method of assuring himself that the contractor will meet all tort obligations in requiring an indemnity bond signed by responsible sureties, it would seem that in most cases the contractee would only measure up to the standard of due care so as to avoid responsibility when the contractor is able to discharge tort claims arising out of the enterprise." At *page* 344.

This passage was written in 1934. At the present time it is a matter of common knowledge that liability insurance to cover such demolition operations is available to contractors and it may be assumed fairly that procurement of that type coverage is regarded as an ordinary business expense. Financial responsibility has nothing to do with legal liability of the contractor. The fact of capacity to respond in damages, of course, would be immaterial on the issue of his negligence in causing a plaintiff's injury. If the principle under discussion became engrafted in the law and financial incapacity of the contractor became a factor to be considered in determining whether a competent contractor had been selected, such lack of capacity would be relevant only in an action against the contractee. And in any event, in the usual tort action against the latter, liability would not come into existence unless negligence of the contractor was established.

But this precise facet of the problem of Toti's competency was not raised at the trial or in the briefs. It arose as an emanation of the oral argument. Consequently, no decision is rendered with respect to it and the matter is expressly reserved.

Under exception (c), on which plaintiffs rely principally, liability will be imposed upon the landowner in spite of the engagement of an independent contractor if the work to be done constitutes a nuisance *per se.* The phrase "nuisance

*per se,"* although used with some frequency in the reported cases, is difficult of definition. In *McAndrews v. Collerd,* 42 *N. J. L.* 189 (*E. & A.* 1880), McAndrews contracted to build a tunnel for a railroad. In the course of the work he constructed a magazine within the limits of Jersey City for the storage of explosive materials which were used in blasting the rock. An explosion occurred therein which did great damage to property in the vicinity. The Court of Errors and Appeals found liability without proof of negligence, declaring that the keeping of gunpowder, nitroglycerine or other explosive substances, in large quantities, in the vicinity of a dwelling house or place of business is a nuisance *per se.* Later, in *Simon v. Henry,,* 62 *N. J. L.* 486 (*Sup. Ct.* 1898), defendants were constructing a sewer in a public street and used dynamite to blast out trap rock in making the necessary excavation. Damage resulted to a nearby factory. The activity was held not to be a nuisance *per se* and a charge to the jury that negligence had to be shown was adjudged proper. In *Doughty v. Atlantic City Business League,* 80 *A.* 473 (*E. & A.* 1911), the League arranged with an independent contractor for a display of fireworks on a vacant lot in a crowded part of Atlantic City, and as a result plaintiff's property was destroyed by fire. The Court of Errors and Appeals held the League responsible on the theory that the project was a nuisance. No reference was made to any proof of the contractor's negligence. Four months later, in *Reisman v. Public Service Corporation,* 82 *N. J. L.* 464 (*E. & A.* 1911), the same court, without reference to *Doughty,* decided that the employment of an independent contractor for an exhibition of fireworks insulated the contractee from liability for the contractor's negligence. There was no discussion of the theory of nuisance.

Without undertaking an exhaustive review of the cases in our State where the expression appears, it seems proper to say that the legal content of "nuisance *per se"* and the application thereof in a factual framework such as that now before us, is anything but clear. And we agree with

the Appellate Division that in these times it is of doubtful utility. In *Sarno v. Gulf Refining Co.,* 99 *N. J. L.* 340, 342 (*Sup. Ct.* 1924), affirmed 102 *N. J. L.* 223 (*E. & A.* 1925), the court equated it with "inherently dangerous" and this appears to have set in motion a trend toward the view now espoused by the *Restatement, Torts,* §§ 835(*e*), 416. See *Gibilterra v. Rosemawr Homes,* 19 *N. J.* 166 (1955); *Bergquist v. Penterman, supra,* 46 *N. J. Super.* at *page* 84; *Harper and James, supra,* at *page* 1408; *Prosser, supra,* at *page* 360.

■ Section 416 of the *Restatement* propounds a rule which would impose liability upon the landowner who engages an independent contractor to do work which he should recognize as necessarily requiring the creation during its progress of a condition involving a peculiar risk of harm to others unless special precautions are taken, if the contractor is negligent in failing to take those precautions. Such work may be said to be inherently dangerous, *i. e.,* an activity which can be carried on safely only by the exercise of special skill and care, and which involves grave risk of danger to persons or property if negligently done. *Restatement, supra,* § 835, *comment on clause (e), page* 285. The term signifies that danger inheres in the activity itself at all times, so as to require special precautions to be taken with regard to it to avoid injury. It means more than simply danger arising from the casual or collateral negligence of persons engaged in it under particular circumstances. *Vogrin v. Forum Cafeterias of America,* 308 *S. W. 2d* 617 (*Mo. Sup. Ct.* 1957); *Neal v. Home Builders,* 232 *Ind.* 160, 111 *N. E. 2d* 280, 713 (*Sup. Ct.* 1953). The elaborate monographs on the subject appearing in 23 *A. L. R.* 984 and 1084 (1923), after referring in great detail to the many instances of judicial use of "inherently dangerous," distill therefrom as a basic connotation that the term imports a danger which is incidental to and characteristic of the work itself, and not one which arises solely from the means and methods of its performance. 23 *A. L. R.* at *page* 1095.

██ It is important to distinguish an operation which may be classed as inherently dangerous from one that is ultra-hazardous. The latter is described as one which "(a) necessarily involves a serious risk of harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage." *Restatement, supra,* § 520. The distinction is important because liability is absolute where the work is ultra-hazardous, as in *McAndrews v. Collerd, supra; Restatement, supra,* § 835, *comment on clause (f), p.* 286; *Harper and James, supra,* at *p.* 1408; but it is contingent on proof of negligence in cases of inherently dangerous activity. 23 *A. L. R.,* at *page* 1094; *Restatement, supra,* § 416, *comment, page* 1128; *cf. Gibilterra v. Rosemawr Homes, supra.* The difficulty with the use of "nuisance *per se"* in our cases comes in large measure from the failure to distinguish between the two types of hazard. In our judgment in the future in a factual context, such as is present here, decision will be facilitated if liability is tested in terms of these distinctions.

There is no doubt that the line between work which is ordinary, usual and commonplace, and that which is inherently dangerous because its very nature involves a peculiar and high risk of harm to members of the public or adjoining proprietors of land unless special precautions are taken, is somewhat shadowy. At least one basis for classification must stem from a common realization by reasonable men that a higher incidence of accidents is ordinarily associated with the latter type of work. The perimeter of an all-inclusive category cannot be drawn except in the general terms of the rule, and its application must be left in large measure to the gradual accumulation of precedents. See 23 *A. L. R.,* at *pages* 1026, 1027. For the present, we need deal only with the case before us.

There is some conflict in the decisions as to whether demolition activity is one which necessarily involves a peculiar risk of harm to members of the public or to ad-

joining property. The current New York rule is that the razing of buildings in a busy, built-up section of a city is inherently dangerous within the contemplation of section 416 of the *Restatement*. *Hanley v. Central Sav. Bank*, 255 *App. Div.* 542, 8 *N. Y. S. 2d* 371 (*App. Div.* 1938), affirmed 280 *N. Y.* 734, 21 *N. E. 2d* 513 (*Ct. App.* 1939); *Janice v. State*, 107 *N. Y. S. 2d* 674 (*Ct. Claims* 1951); compare Cardozo, J., in *Hyman v. Barrett*, 224 *N. Y.* 436, 121 *N. E.* 271 (*Ct. App.* 1918). In analogous situations a number of jurisdictions have reached the same conclusion.

In *Whalen v. Shivek*, 326 *Mass.* 142, 93 *N. E. 2d* 393, 399, 33 *A. L. R. 2d* 74 (*Sup. Jud. Ct.* 1950), an owner engaged an independent contractor to make extensive alterations on his building adjoining a public sidewalk, including the removal of a large parapet of cast stone blocks. Through the contractor's negligence, some blocks fell from the parapet, killing a pedestrian. The owner was held liable because the "removal of the parapet by the contractor \* \* \* involved work of such kind that it would probably cause injury to persons using the sidewalk below unless special precautions were taken." To like effect are *Marks v. F. W. Woolworth Co.*, 32 *F. 2d* 145 (5 *Cir.* 1929); *Brent v. Baldwin*, 160 *Ala.* 635, 49 *So.* 343 (*Sup. Ct.* 1909); *Langrell v. Harrington*, 3 *Terry* 547, 42 *Del.* 547, 41 *A. 2d* 461 (*Super. Ct.* 1945); *Vinton Petroleum Co. v. L. Seiss Oil Syndicate*, 19 *La. App.* 179, 139 *So.* 543 (*Ct. App.* 1932); *Stubblefield v. Federal Reserve Bank of St. Louis*, 356 *Mo.* 1018, 204 *S. W. 2d* 718 (*Sup. Ct.* 1947); *Covington & Cincinnati Bridge Co. v. Steinbrock*, 61 *Ohio St.* 215, 55 *N. E.* 618 (*Sup. Ct.* 1899); *Prosser, supra*, at *page* 360.

In this connection, the comment of the court in *Van Auken v. Barr*, 270 *Ill. App.* 150 (*App. Ct.* 1933), is noteworthy:

"We know of no way to tear down a brick wall that would not be dangerous to people walking along [the public street] unless there was precaution taken to protect the public from the pieces of bricks falling during the operation. The only way to take down the walls

of a brick building is in some way to loosen the bricks, and whatever way it is done there is danger that the brick may fall from the wall. If it is in a place where people are passing by, the falling bricks are extremely likely to hurt some one." (Insertion ours)

In our judgment, the doctrine adopted by New York and the other jurisdictions cited represents the sound and just concept to be applied. And within the broad outlines thereof, where the minds of reasonable men might differ as to whether the activity contracted for by the landowner is inherently dangerous or involves a peculiar risk of harm to others unless special precautions are taken, the issue is for jury determination. *Whalen v. Shivek, supra,* 93 *N. E.* 2d at *page* 400. On the facts of this case, as outlined above, we have no hesitancy in saying that such course should have been pursued.

If the Authority had undertaken to raze the buildings by its own employees, obviously it would have been required to exercise care commensurate with the risk of damage to Majestic's property. The effect of the principle approved as controlling with respect to the liability of the landowner is to declare that the duty owed by the Authority to Majestic and Bohen's is non-delegable. That is, the duty is absolute, not the liability, and it cannot be put aside and immunity gained through the agency of an independent contract. *Restatement, supra,* § 415, *Topic 2, Introductory Note; Harper and James, supra,* at *page* 1408. As was said in *Stubblefield v. Federal Reserve Bank of St. Louis, supra* [356 *Mo.* 1018, 204 *S. W. 2d* 722]:

"The mere recital of the nature of the work and the surroundings demonstrate its inherent danger and there was a primary, non-delegable duty upon the owner * * * to take measures commensurate with the danger."

In *Covington & Cincinnati Bridge Co. v. Steinbrock, supra* [61 *Ohio St.* 215, 55 *N. E.* 621], an owner employed a contractor to tear down the walls of his fire-ruined brick warehouse. While the contractor was attempting to pull

down one wall by means of a rope, it fell outward and onto plaintiff's property, situated on the other side of an alley separating the buildings. The owner was adjudged responsible because the demolition "necessarily involved danger to others, unless great care was used," and "the duty to observe such care * * * cannot be delegated to another, so as to avoid liability for its neglect." Although the courts of this State have not previously had occasion to assert as non-delegable the duty on the part of a landowner in circumstances such as are present here, that type of duty is not unknown to our law. Examples may be found in *Newman v. Pasternack,* 103 *N. J. L.* 434, 438 *(E. & A.* 1927); *Wilczynski v. Penna. R. R. Co.,* 90 *N. J. L.* 178, 182 *(E. & A.* 1917); and *Sebeck v. Plattdeutsche Volkfest Verein,* 64 *N. J. L.* 624 *(E. & A.* 1900). The social value of the duty to the community is so significant that the law cannot allow it to be transferred to another. In a comparison of the interests involved in the instances cited, we hold the view that those now before us warrant at least as great if not greater protection and that thus the duty the Authority owed to Majestic and Bohen's likewise must be deemed to be non-delegable.

It is urged that such a burden ought not to be imposed upon a landowner who is not competent to do the work himself and so must turn to a person following the necessary independent calling in the particular field to accomplish the result sought. But in the resolution of the conflicting interests of the innocent injured person and the landowner who chose the contractor, justice and equity demand recognition of the absolute duty.

The same argument was made in the similar case of *Covington & Cincinnati Bridge Co. v. Steinbrock, supra,* and met with this expressive answer:

"It is urged as unreasonable that one who has work to perform, that he himself cannot perform from want of knowledge or skill, should be held liable for the negligence of one whom he employed to do it, since, if he did reserve control, it would avail nothing, from

his own want of knowledge and skill. There is a seeming force in this, but only so. It is not agreeable to the principles of distributive justice; for it is equally a hardship that one should suffer loss by the negligent performance of work which another procured to be done for his own benefit, and which he in no way promoted and over which he had no control. Hence, where work is to be done that may endanger others, there is no real hardship in holding the party for whom it is done responsible for neglect in doing it. Though he may not be able to do it himself, or intelligently supervise it, he will nevertheless be the more careful in selecting an agent to act for him. This is a duty which arises in all cases where an agent is employed, and no harm can come from stimulating its exercise in the employment of an independent contractor, where the rights of others are concerned."

For the reasons stated herein, the judgment of the Appellate Division is affirmed and the matter is remanded for a new trial against the Parking Authority.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.