Lucille A. BREECE, Administratrix Ad Prosequendum of the Estate of Jerry C. Breece, Plaintiff-Appellee,

v.

J. F. CHAPMAN & SON, INC., Defendant-Appellant.

No. 13659.

United States Court of Appeals Third Circuit.

Argued Dec. 19, 1961.

Decided April 17, 1962.

John W. Taylor, East Orange, N. J., for appellant.

Richard J. Feinberg, Bayonne, N. J. (Feinberg, Dee & Feinberg, William M. Feinberg, Bayonne, N. J., and Edward T. Kelley, Clearfield, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Defendant appeals from a plaintiff's judgment in this tort death case.

On November 21, 1959 plaintiff's decedent was the foreman (its "expert on the job", as Construction's project manager described him) for Construction Service Company, a subcontractor on a New Jersey State Highway construction project in Bayonne, New Jersey. Defendant was the general contractor for the work.

Under the terms of the contract between the Highway Department and the Chapman company the latter was required to subcontract the removal and relocation of fuel oil pipelines, owned by Bayonne Industries, Inc., and lying in the path of the new highway, to a "member in good standing of the Pipeline Contractors Association, Dallas, Texas," such subcontractor to be approved by the owner of the pipelines. The subcontractor was to work under the supervision of the State Highway Engineer and the owner. In accordance with its contract, defendant subcontracted the work to Construction Service Company.

The subcontracted work consisted of the digging up and removal of four buried 8″ pipelines and the laying of twin buried 12″ pipelines elsewhere in their stead. The latter entailed the digging of a long trench which, due to the contour of the land and under the contract specifications, extended at points to depths of more than fifteen feet passing very close to an overhead bridge abutment. After laying the heavy one ton 12″ pipe sections and welding them together, the subcontractor had to test the

pipeline for leakage. The contract provided:

"Leakage Testing to test the tightness of field joints, shall be performed under a test pressure of 100 psi held steady for 20 minutes. * *

"Test pressure shall be supplied by compressed air. If the test is performed on the entire lines, compressed air, but no gauges will be supplied by Bayonne Industries Inc. If the pipeline subcontractor chooses to test portions of the line, compressed air and gauges shall be furnished by the subcontractor."

It was during one of those tests that decedent was killed. At the time, the twin pipeline had reached 3,000 feet in length and was laying at the bottom of the muddy trench near the concrete abutement to an overhead bridge; the State's engineers were afraid of the possibility of a collapse of the bridge. In preparation for this, the second test, one end of the second twin pipeline was capped and completely sealed while the other end was capped with a plug containing a pipe nipple, a gate valve which could be closed manually when the pressure inside the pipeline reached 100 psi, and an air gauge to determine when that pressure was reached. Having chosen to test the pipelines in portions, the subcontractor had to furnish its own equipment under the quoted terms of the contract. To supply the compressed air, the subcontractor's own rubber hose was connected from the pipe nipple to a large compressor standing at ground level. The compressor was freely lent the subcontractor by the defendant. The subcontractor's hose was originally fifty feet in length but, sometime prior to the accident, it had broken and was spliced together both before the first and this second test of the pipeline by some unknown employee of the subcontractor. The splicing was done haphazardly; the metal tube inserted into the broken ends of the hose was smooth, not serrated to permit the two holding clamps to work effectively. Moreover the tube was not inserted into the ends of the hose a sufficient distance, and the subcontractor did not use a check valve to prevent air from rushing out of the pipeline in the event the hose or its couplings broke.

After the preparations were completed, the decedent descended to the bottom of the trench and the compressor was started. Within fifteen or twenty minutes, when the pressure in the pipeline reached 98 psi, the operator of the compressor heard a "popping" sound and stopped the compressor. Apparently unable to hear the sound himself due to the noise of the compressor's operation at the bottom of the trench, decedent climbed a ladder out of the trench and was told by the operator what he had heard. Decedent concluded that it "was nothing", instructed the operator to restart the compressor, and again descended into the trench. Shortly thereafter, the splice came apart with an explosive noise. The air compressed in the pipeline rushed out of the broken end of the hose attached to the pipeline hurling a large quantity of mud, shoring material and other debris out of the trench. That broken end snaked about in the narrow confines of the trench, struck and killed decedent.

At the end of plaintiff's case, defendant moved to dismiss the complaint and enter judgment in its favor on the ground that the proofs presented did not warrant the claim going to the jury. It was argued on behalf of the plaintiff that the entire surroundings of the project made the work inherently dangerous. The court denied the motion "at this time". After the defense evidence had concluded, the plaintiff withdrew her theories of liability as to the defective compressor and retention of control by Chapman. This left, as stated by her attorney, " * * * the theory of the dangerous, inherently dangerous activity as the plaintiff's basis for recovery in the action."

The defense then moved for judgment on the ground that plaintiff had failed to offer evidence sufficient to go to the jury on the inherently dangerous activity issue. The trial court in taking the motion under advisement and permitting the question to be submitted to

the jury stated "I think the test is whether or not the operation is of an inherently dangerous nature, of a nature to which necessarily there attaches great danger." The plaintiff agreed with this thought arguing " * * * that the inherently dangerous nature of the operation was found in the total circumstances of the job as I have indicated before."

The court charged "This defendant may not be found responsible unless the work which the subcontractor was doing was by its very nature inherently dangerous." The jury returned twice for instructions re "inherently dangerous". On its second appearance the court charged "If an employee of the Construction Company is negligent and that negligence is the proximate cause of the injuries sustained, and the work itself is inherently dangerous, then the negligence of the Construction Company is attributable to the prime contractor, or the defendant in this case." Thereafter the jury rendered a verdict in favor of the plaintiff.

On the motion n. o. v. it was argued that the activity had not been shown to be inherently dangerous, that the cause of the accident had been the breaking of the poorly mended hose. The court correctly interpreted that argument to " * * say that the danger arose not from the nature of the work but from the fact that the subcontractor used an improper tool * * * which the prime contractor had no reason to suspect he would use. * * * And that of itself the operation of digging the ditch and testing was not inherently dangerous." The court in denying the motion said:

"Now it seems to me that, as you say, we must go back to the time of the inception of the work, the making of the contract. At that time it was evident that the pipeline was to be laid and tested. There was no particular length set at which the pipe must be tested, and therefore it certainly was not impossible to contemplate that it might be three thousand feet or a thousand feet. There was the idea that the ditch would extend in some places, you say, to fifteen or seventeen feet. There was the further idea that it would be close to this abutment or bridge. Now you seem to say that the danger to the abutment was something which would not make this inherently dangerous, but I think that danger to the abutment is inseparable from danger to the general operation.

"I think that ultimately the question of fact as to whether or not this was an inherently dangerous activity is a question for the jury, but only if reasonable minds in operating on the same facts could disagree.

"No matter what my personal opinion might be I think that there was a question upon which reasonable minds might disagree and I shall therefore deny your motion in both respects."

■ It is properly agreed that New Jersey substantive law governs. Both sides further agree that the Majestic Associates, Inc. v. Toti Contracting Co. litigation is controlling here. There the Appellate Division in 54 N.J.Super. 419, 431, 149 A.2d 288, 294, held that what distinguishes inherently dangerous activities from others " * * * is the probability that injurious consequences will attend their performance even if reasonable care is exercised." In the affirmance of that decision the New Jersey Supreme Court stated that inherently dangerous " * * * signifies that danger inheres in the activity itself at all times, so as to require special precautions to be taken with regard to it to avoid injury. * * * The elaborate monographs on the subject appearing in 23 A.L.R. 984 and 1084 (1923), after referring in great detail to the many instances of judicial use of 'inherently dangerous,' distill therefrom as a basic connotation that the term imports a danger which is *incidental to and characteristic of the work itself, and not one which arises solely from the means and methods of its performance.* 23 A.L.R. at page 1095." 30 N.J. 425, 435, 153 A.2d 321 (1959). (Emphasis supplied). And at page 438,

at page 328 of 153 A.2d it says "The mere recital of the nature of the work and the surroundings demonstrates its inherent danger * * *."

▮ Though there was some atmospheric talk about inherent danger in connection with the depth of the ditch, its proximity to the bridge abutment, the use of the pipe in such a deep ditch and the presence of the water those circumstances never came into the orbit of this accident or bore the slightest relationship thereto.[1] Nor was the pressure testing established as inherently dangerous. It was regarding this that the primary affirmative effort was made to develop a jury question. Jerome Polander, a professor in the mechanical engineering department of Newark College of Engineering testified as an expert on behalf of the plaintiff. The court asked him "But would the operation, simply the operation of raising the pressure to a hundred pounds per square inch inside the pipe to which the tube is attached— would that be an inherently dangerous operation?" The witness finally answered "Possibly". Asked by the court if under the explicitly stated job conditions " * * * would the operation, simply the operation of raising the pressure to a hundred pounds per square inch inside the pipe to which the tube is attached, would that be an inherently dangerous operation?" The witness again finally answered "Possibly". He made it very clear that it was the use of the improperly spliced pipe that made the testing dangerous. On cross-examination he re-

iterated that it was the failure to use the serrated pipe mender that differentiated the method used by the subcontractor in the pressure test from the standard or customary operation.[2]

Counsel for appellee also assert in their brief that "The contract between the defendant and the Highway Department under which the work in question was being performed recognized that 'extraordinary precautions' were 'required to complete the pipeline relocations safely and properly * * * ' ". The full text in the contract reveals that this concerns the owners of the property involved. The contract reads:

"The low specific gravity, volatibility and combustability of the fluid pumped through the lines, dictates extraordinary precautions and cooperation with the owner during the execution of the relocations * * *.

*    *    *    *    *    *

"The Contractor is cautioned that available right of way and available working space makes it necessary at some locations to construct the relocation in close proximity to the existing oil pipes.

*    *    *    *    *    *

"Because of the extraordinary precautions required to complete the pipeline relocations safely and properly, the Contractor and/or subcontractors shall be responsible for giving notification of intention to begin or terminate any work of the Project, within five (5) feet of the exist-

---

1. It is plaintiff's contention that the dangers involved in these additional circumstances, although not remotely connected with her husband's death, were properly considered by the jury. But these *unrealized* dangers are immaterial and supply no causal connection between any inherent danger and Breece's death. The inherent danger doctrine is applicable only when the *realized* dangers were inherent in the activity causing the injury which in fact occurred. The injury must be "caused by negligence in a particular detail of the work which in *itself* is * * inherently dangerous." Restatement, Torts § 427, comment a. (Emphasis

supplied). Plaintiff's expert evidence proved that the type of air testing operation conducted in this case was *not*, in itself, inherently dangerous. See Gibilterra v. Rosemawr Homes, 19 N.J. 166, 172, 115 A.2d 553 (1955). Compare Majestic Realty Associates, supra, 54 N.J. Super. at 434–435, 149 A.2d 288.

2. Cutter, Construction Service's project manager, testified that the hundred pounds pressure per square inch was "not a high pressure for testing a pipeline, no." He said that pipeline test pressures "can go from a hundred pounds to twelve hundred pounds, and I guess even higher than that."

ing or relocated fuel oil lines. Such notification shall be given to the owner in person or by telephone, and at least one hour prior to the beginning or termination of work."

Under the proofs—all of them—the sole cause of the unfortunate accident to decedent was the parting of the poorly repaired breach in the hose. That improper repair stemmed not from the job itself but " * * * from the causal or collateral negligence of persons engaged in it under particular circumstances." Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. at p. 435, 153 A.2d at p. 326. It emanated " * * * solely from the means and methods of its performance." Idem p. 435, 153 A.2d at p. 426. And the person directly responsible for the improper repair was the Construction Service foreman and expert on the particular work. It was one or more of his men who made the repair. It was decedent himself who came out of the trench after the operator had stopped the compressor on hearing a "popping" sound. It was the decedent who, being advised of the situation by the operator, concluded it was "nothing" and instructed him to restart the compressor. It was shortly after that that the splice gave way with the broken end of the hose striking decedent who had returned to the trench. None of the other job conditions entered into that happening. The use of the unfit hose by deceased for Construction Service cannot be attributed to the Chapman job. It was simply and entirely the means and method used by Construction Service through its foreman Breece in performing its own specialized work.

Plaintiff's evidence shows that the routine compression test which took place was of itself neither actually or potentially dangerous. It is not contended that the selection of the hosing for that test offered any difficulty. Common sense, completely apart from deceased's skilled judgment, merely called for the use of sound hose, called for automatic rejection of defectively spliced hose. There has been no case in law or in justice of inherent danger proceeding from the use of the faulty hose, made out in the record before us against the defendant.

We have examined the other points raised by appellant. In view of our above stated findings there is no need of passing on these at this time.

The judgment of the district court will be reversed and the cause remanded for entry of judgment in favor of the defendant against the plaintiff.