Thomas P. **ROBINSON**, Executor of the Estate of Raymond P. Robinson, deceased, Appellant,

v.

**JIFFY EXECUTIVE LIMOUSINE CO.; Best Executive Limousine Service; Rizzo DeCecco, Administrator of the Estate of Richard A. DeCecco, Deceased; Atlantic City Showboat, A Wholly Owned Subsidiary of Ocean Showboat, Inc. and Showboat, Inc., and all of these, t/a The Showboat Casino Hotel.**

No. 92–5649.

United States Court of Appeals, Third Circuit.

Argued June 23, 1993.

Decided Sept. 9, 1993.

Slade H. McLaughlin (argued), Law Offices of Stanley P. Kops, Philadelphia, PA, for appellant.

Jeffrey B. McCarron (argued), Swartz, Campbell & Detweiler, Philadelphia, PA, for appellees.

Before: STAPLETON, MANSMANN and HUTCHINSON, Circuit Judges.

## OPINION· OF THE COURT

MANSMANN, Circuit Judge.

These consolidated diversity actions arise from a fatal car accident which took the lives of the appellant's father and of the driver of a limousine hired by a casino to transport one of its patrons from the ·Philadelphia airport. The main issue we address is whether, under New Jersey law, one (such as the casino) who hires an independent contractor who is uninsured, or financially unable to pay tort judgments, as was the limousine company and its driver, is liable in tort for that independent contractor's negligence under New Jersey's "incompetent contractor" exception to the general rule against such imputed liability. We addressed this issue in *Becker v. Interstate Properties*, 569 F.2d 1203 (3d Cir.1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978), holding that the "incompetent contractor" exception extends to financial incompetence. The district court declined to follow *Becker*'s majority opinion.

We must also review the sufficiency of the evidence of the casino's alleged direct negligence based on actual or constructive knowledge of the independent contractor's physical incompetence to drive. Finally, this appeal also raises the issue of whether the casino's deviation from its own self-imposed internal hiring criteria, or the fact that it failed to ascertain that the hired independent contractor was not currently registered with the Interstate· Commerce Commission, constitutes direct negligence.

The district court granted summary judgment in favor of Showboat on October 20, 1992, and entered an order on December 15, 1992, directing the entry of a final judgment in accordance with Fed.R.Civ.P. 54(b).[1] This is an appeal from that order.

## I.

The tragic events giving rise to this suit occurred on November 29, 1988, when Richard DeCecco, the driver of the independent contractor limousine service hired by Showboat to transport a patron, Augusto Jorge, from the Philadelphia International Airport, suffered a fatal heart attack en route from the airport, causing the limousine to swerve into oncoming ·traffic on the New Jersey side of the Walt Whitman Bridge. The ensuing accident was also fatal to Raymond Robinson, the driver of the car which collided head-on with the limousine. Augusto Jorge was severely injured in that accident as well.

DeCecco had a history of heart disease, and the evening before the accident, he visited the emergency room of the Atlantic City Medical Center with chest pains. He was released, however, with a prescription to treat gastritis, an apparent misdiagnosis. Before leaving the airport with Jorge the following day, DeCecco expressed the fact that he was not feeling well and told Jorge that he needed to place a telephone call. DeCecco entered the airport terminal, presumably to locate a telephone booth, but Jorge did not actually witness DeCecco placing the alleged call, nor did he hear any of the alleged telephone conversation. While it appears likely that DeCecco in fact placed a call, perhaps to Showboat, it remains unclear whether DeCecco indicated to Showboat that he was ill, how seriously ill he was feeling at the time, and whether he requested assistance.

An Interstate Commerce Commission investigation subsequent to the accident revealed that the limousine was not insured or ICC approved at the time of the accident, and was thus in service in violation of federal law. We must decide initially whether Showboat's failure to assure that the independent contractor limousine service was insured and thus "financially competent" renders Showboat liable, either imputedly or directly, to the uncompensated victims of the contractor's negligence on the theory of having knowingly engaged an incompetent contractor.

We note preliminarily that Internal Operating Procedure 9.1 reflects our tradition that reported panel decisions are binding

---

1. Default judgments were entered against all other named defendants, Jiffy Executive Limousine Co., Best Executive Limousine Service and Rizzo

DeCecco, Administrator of the Estate of Richard A. DeCecco, Deceased.

on subsequent panels, and *in banc* consideration is required before overruling such decisions. However, when we are applying state law and there is persuasive evidence that it has undergone a change, we are not bound by our previous panel decision if it reflected our reliance on state law prior to its modification. *Smith v. Calgon Carbon Corp.,* 917 F.2d 1338, 1343 (3d Cir.1990). This is such a case in that two .appellate decisions of the New Jersey courts, handed down subsequent to our *Becker* decision, have rejected the *Becker* extension of the "incompetent contractor" exception. We, as a panel, are thus not bound by *Becker*'s view of New Jersey law.

## II.

Faced with the issue of whether liability in tort for the negligence of a financially incompetent independent contractor falls on the hiring entity, the New Jersey Supreme Court noted that "ordinarily where a person engages a contractor, who conducts an independent business by means of his own employees, to do work not in itself a nuisance ..., he is not liable for the negligent acts of the contractor in the performance of the contract." *Majestic Realty Associates, Inc. v. Toti Contracting Co.,* 30 N.J. 425, 153 A.2d 321, 324 (1959) (citations omitted). The court further noted that this general rule of employer nonliability gives way under certain limited circumstances. The only traditionally recognized exception relevant to the present case is where the employer knowingly engages an "incompetent contractor." *Id. See also Terranella v. Union Bldg. & Const. Co.,* 3 N.J. 443, 70 A.2d 753 (1950); *Izhaky v. Jamesway Corp.,* 195 N.J.Super. 103, 478 A.2d 416 (1984). In dictum which would expand the "incompetent contractor" exception beyond all precedent, however, the court suggested that "in the application of concepts of distributive justice perhaps ... a loss arising out of the tortious conduct of a financially irresponsible contractor should fall on the contractee." *Id.* 153 A.2d at 325. Thus, the court indicated its potential amenity to holding a contractee duty bound, before hiring independent contractors, to determine the independent contractor's financial capacity to respond to tort claims. The court,

however, was not poised to issue a dispositive statement on this matter and expressly reserved it. *Id.*

We were called upon to evaluate the *Majestic* court's dictum in *Becker v. Interstate Properties,* 569 F.2d 1203 (3d Cir.1977), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978), and to address·the question which the New Jersey Supreme Court reserved. Our task was to predict what the New Jersey Supreme Court would. do, in light of *Majestic* and informed by the "doctrinal trends," public policies and judicial precedence which formed the applicable state law, if confronted with the facts of *Becker. Id.* at 1206. We noted that "the liability of employers [for the tortious acts of independent contractors] has emanated from the exceptions articulated in [*Majestic* ]." *Becker,* 569 F.2d at 1207. Based upon the suggestions of the *Majestic* court regarding the application of distributive justice, we concluded that the New Jersey Supreme Court would be likely to hold that employing a financially irresponsible or uninsured independent contractor is tantamount to hiring an "incompetent contractor," and thus places the employer outside the scope of any immunity to tort damages. *Id* at 1209. We justified the novelty of this holding by adverting to contemporary business practice and industry conditions, which reflect the wide availability of insurance, and thus warrant a normative judicial policy of shifting the burden of the loss from the tortious negligent conduct of a "judgment proof" contractor onto the party best able to compensate the victim.

The *Becker* opinion produced a strong dissent which argued primarily that the majority's decision was not an apt estimate of what the New Jersey courts would likely hold. *Id.* at 1215. The dissent characterized the *Majestic* court's controversial dictum as merely " 'an emanation of the oral argument,' " not nearly sufficiently indicative that the New Jersey Supreme Court was poised to articulate a novel standard of tort liability—one which had not until then been adopted in any other jurisdiction in the country. *Id.*

Since our decision in *Becker,* the Superior Court of New Jersey, Appellate Division has

twice rejected the *Becker* majority holding. In *Cassano v. Aschoff,* 226 N.J.Super. 110, 543 A.2d 973, *certif. denied,* 113 N.J. 371, 550 A.2d 476 (1988), the employee of an independent contractor tree removal company brought suit against landowners for an injury he sustained during a tree removal operation conducted on the landowner's property. The plaintiff based his claim for liability against the landowners on the allegation that the landowners negligently hired an independent contractor who was financially insecure, and hence knowingly engaged an incompetent contractor. On the facts of the case, the court could not impute to the landowners any knowledge, actual or constructive, of the contractor's financial incompetence. Explicitly confronting our holding in *Becker* and the *Majestic* dictum, the court also, as a matter of law, unambiguously rejected *Becker*'s characterization of financial irresponsibility as a category of incompetence. The court held,

> Although no court in this state, either before *Majestic,* or in the intervening 19 years had chosen to apply [the concept of a tort duty based on financial capacity], the majority in *Becker* nevertheless predicted that future New Jersey courts would do so. No court has since chosen to follow that lead. In these circumstances, nor do we.

543 A.2d at 976 (citations omitted).

Similarly, a few years earlier, in *Miltz v. Borroughs–Shelving, Div. of Lear Siegler, Inc.,* 203 N.J.Super. 451, 497 A.2d 516 (1985), a plaintiff who was injured on negligently installed steps in a department store based her theory of liability against the independent contractor, Borroughs–Shelving, on the "judgment proof" financial status of the subcontractor hired by Borroughs. In addition to not finding sufficient evidence to prove the sub-contractor's alleged insolvency, the court stated that,

> Plaintiff cites no authority for the proposition that barring a plaintiff from recovery against a contractor or sub-contractor where the sub-contractor who has been found liable for plaintiff's injuries is insolvent is contrary to New Jersey public policy. As [stated in the *Becker* dissent] ..., "New Jersey's courts have never defined the scope of a tort *duty* on the basis of an individual's financial capabilities."

497 A.2d at 524 (citing *Becker,* 569 F.2d at 1216).

In the present appeal, Robinson relies upon the majority holding in *Becker,* arguing that liability for the accident should be assessed against Showboat, which hired an uninsured limousine service, where that limousine service is now insolvent, and where the negligent driver's estate has no assets. Showboat argues that *Becker* misapprehended the import of the *Majestic* dictum on New Jersey tort law, and that *Cassano* and *Miltz* supersede *Becker* as controlling precedent here.

### III.

The district court's entry of summary judgment was based on two grounds. First, the court did not find sufficient evidence from which a jury could reasonably surmise that Showboat *knowingly* hired a financially or physically incompetent contractor. The court found that the telephone call allegedly made by the limousine driver from the airport, absent any other indicia, did not raise a jury issue. Even assuming that the call was placed to Showboat, the court did not find any evidence from which a jury could reasonably conclude that the driver informed Showboat of his physical state during that call, or that Showboat, if it had knowledge of the driver's precarious health, ordered the driver to proceed without assistance. Thus, there remained only the second basis for the court's decision—the legal question of whether hiring a contractor without affirmatively investigating his financial or insurance status constitutes a basis for imputing liability for DeCecco's negligence to Showboat.

Noting the New Jersey appellate court's deviation from *Becker* in both *Cassano* and *Miltz,* the district court considered it no longer reasonable for a federal court to predict that the New Jersey Supreme Court would adopt the novel expansion of the "incompetent contractor" exception. Moreover, the district court found ample alternative reason to distinguish the present case from *Becker* on the basis that *Becker* involved a

construction contractor and its sub-contractor, while the present case involves a driver. The court explained that the nature of the two businesses are distinct in significant ways, such as the degree to which the employer is able to observe directly the development of risk factors, making the application of *Becker* to the present case even more attenuated. A property owner is generally more proximately involved in the activities of the contracted help than would be persons or businesses which hire drivers or messenger services. Furthermore, the court reasoned that the strong state and federal regulatory overlay in the motor vehicle passenger industry militates against novel forms of judicially imposed liability. Thus the district court's holding indicates that even if *Becker* were an accurate exposition of the then current state of New Jersey tort law, it would not necessarily control, in the absence of a pronouncement from the state's Supreme Court, outside the context of the construction industry or closely analogous industries.

### IV.

■ At the outset we note that, although state intermediate appellate decisions are not automatically controlling where the highest court of the state has not spoken, where, as here, jurisdiction in federal court is based on diversity of citizenship, we must give serious consideration to the decisions of the intermediate appellate courts in ascertaining and applying state law. *See Aetna Casualty & Surety Co. v. Farrell,* 855 F.2d 146, 148 (3d Cir.1988); *see generally, Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Decisions of state intermediate appellate courts which have not been reviewed by the highest court of the state, while not dispositive, are evidence of state law. *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967); *West v. American Tel. and Tel. Co.,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *Wisniewski v. Johns–Manville Corp.,* 759 F.2d 271, 273–74 (3d Cir.1985). In *Burke v. Maassen,* we held that "[i]n the absence of a clear pronouncement from the state's highest court, a federal court may consider the decisions of the state's intermediate appellate courts." 904

F.2d 178, 182 (3d Cir.1990) (citing *Erie Castings Co. v. Grinding Supply, Inc.,* 736 F.2d 99, 100 (3d Cir.1984)).

■ Thus, the *Cassano* and *Miltz* cases inform our decision on this appeal. In light of the application of New Jersey law in those cases, we predict now that *Becker*'s expansion of the "incompetent contractor" exception to impose liability on Showboat would not likely comport with the New Jersey Supreme Court's pronouncement, were it to confront the issue. Though our earlier attempt in *Becker* to predict accurately a pronouncement of the New Jersey Supreme Court may have been reasonable at the time in light of the *Majestic* dictum, we now have the benefit of two intermediate state appellate decisions directly on point which undermine our former judgment. Moreover the New Jersey intermediate appellate court's unequivocal rejection of the *Becker* majority holding comports with the state of the law in other jurisdictions which have addressed the issue of imposing liability on the principle or employer for the negligence of an uninsured or financially incompetent independent contractor. The appellant does not cite any jurisdiction which has adopted the expansion of the law we set forth in *Becker.*

Policy considerations favor our conservative approach. As the dissent in *Becker* noted, the majority's standard for imposing liability would be an inexact appendage to the standard already provided by the state legislature, and would "cause uncertainty and doubt for every financial strata and every court, as well as hinder the employment opportunities of an independent contractor trying to enter the market place but lacking much in the way of start-up capital." *Becker,* 569 F.2d at 1216. Under *Becker,* any person or entity which contracted for transportation service, from taxis, buses and limousines, to movers and delivery services, would be obliged to make a diligent and continuing inquiry into the financial qualifications of the contractor before calling upon him to perform the transportation service, in order to guard against potential imputed negligence liability. Such a duty would not only be unprecedented, but would indeed impose pro-

hibitive obligations on employers of independent contractors beyond what we are prepared to predict the New Jersey Supreme Court will adopt.

## V.

■ Robinson further argues that even if *Becker* is not authoritative here, there was ample evidence to allow this case to go to the jury on the issue of Showboat's direct negligence. First, Robinson claims that there was sufficient evidence that Showboat knew of DeCecco's deteriorating health state and negligently ordered the driver to proceed in transporting Jorge from the airport. Second, Robinson claims that Showboat knowingly hired a limousine service which was not on Showboat's standard list of approved transportation services, and which was not approved by the Interstate Commerce Commission.

We find both of these claims to be without merit and not to have warranted presentation to a jury. Evidence before the district court pertaining to the first question consisted of the testimony of Jorge as to the alleged telephone call placed from the airport to Showboat by DeCecco. Although Jorge testified that it was his impression, based on what he understood to be the normal operating procedure of drivers for the casino, that DeCecco did, in fact, place a call to Showboat, Jorge's testimony was largely conjectural. Even if a reasonable jury could have found that the telephone call had transpired, given the dearth of evidence, a jury would not have had a factual basis upon which to infer that DeCecco's call was anything other than mere notification to the casino of when it could anticipate his arrival with Jorge. The evidence that DeCecco communicated to Showboat the seriousness of his physical condition, assuming he even understood it to be grave, is simply too thin.

■ Because we cannot find evidence on this record from which a jury could reasonably have imputed actual or constructive knowledge to Showboat of DeCecco's physical incompetence on the date of the accident, we hold that the district court did not err in granting summary judgment. To be sure, the law commits decisions as to logical and reasonable inferences to be drawn from evidence to the jury. Nevertheless, where, as here, the evidence of Showboat's knowledge of DeCecco's physical state leaves such doubt as to preclude any reasonably probable conclusion, the district court was justified in deciding the issue as a matter of law.

■ With regard to evidence proffered that Showboat was negligent when it hired a limousine service which allegedly was not cleared under Showboat's own internal standards and which was not registered with the Interstate Commerce Commission, we find the absence of any facts which satisfy any element which would establish Showboat's liability here. Neither Showboat's self-imposed criteria for hiring independent limousine contractors, nor ICC registration, is legally dispositive on the question of the competence of the limousine service or its drivers. Showboat's self-imposed criteria does not of itself create a legally cognizable standard against which to hold Showboat negligent. A contrary view, as the district court noted, would serve as a disincentive to any industry utilizing the services of independent contractor drivers to adhere to self-regulating standards. Nor is there precedent for holding Showboat liable in negligence solely on the ground that it failed to ascertain that the independent contractor was not currently registered with the ICC. *See, e.g., Stone v. Pinkerton Farms, Inc.,* 741 F.2d 941 (7th Cir.1984).

We are in agreement with the district court that the plaintiffs have not proffered sufficient evidence to raise a material dispute of fact as to whether Showboat breached its duty to exercise reasonable care in the hiring of independent drivers under the law of New Jersey. The exercise of reasonable care here did not impose an affirmative legal duty on Showboat to monitor the physical health of the limousine company's individual drivers, to investigate whether the independent contractor possessed all current permits required by law, or to adhere to self-imposed criteria for the approval of independent limousine vendors. We believe that the expansion of tort liability urged by Robinson is

best left to the New Jersey State legislature or the New Jersey Supreme Court.

## VI.

Because we do not find any theory of tort liability by which the negligence of the independent contractor may here be imputed to Showboat, or by which Showboat may be found directly liable for its own negligence in the hiring of the independent contractor, we will affirm the order of the district court of October 20, 1992, granting summary judgment in favor of Showboat, and entered as a final judgment on December 15, 1992.