Gary R. BECKER, Appellant,

v.

INTERSTATE PROPERTIES, Interstate Construction Corporation, Windsor Contracting Corp., Lawrence Corporation, Diamond Reo, Jamesway Company, Willard F. Edwards, John Doe and Richard Roe, Saul Silverman, A.I.A., Raymond Keyes Engineers.

INTERSTATE PROPERTIES and I. P. Construction Corp., Third-Party Plaintiffs,

v.

WOOD PINE CONSTRUCTORS, INC.

No. 76–2520.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1977.

Decided Dec. 21, 1977.

As Amended Jan. 30, 1978.

Edward B. Meredith, Meredith, Meredith & Chase, Trenton, N. J., for appellant.

Edward J. McCardell, Jr., Trenton, N. J., Thomas P. Weidner, Princeton, N. J., Jamieson, McCardell, Moore, Peskin & Spicer, Trenton, N. J., for Interstate Properties, I. P. Construction Co. and Saul Silverman.

David S. Gordon, Greenbaum, Greenbaum, Rowe & Smith, Woodbridge, N. J., for Raymond Keyes Engineers.

William M. Lake, Dietrich & Lake, Trenton, N. J., for Wood Pine Constructors, Inc.

Before ADAMS, VAN DUSEN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The task of a federal court sitting in diversity is frequently not an easy one, for it must foresake its realm of expertise and assume the aspect of a court of the forum state. Even when applying well-settled law, the federal tribunal must be alert to nuances of precedent. Where, as here, a federal court is asked to pass on the implication of a declaration by a state high court of a new principle in an evolving area of the law, it must act with even greater sensitivity.

In this case, we are called upon to evaluate the effect of a dictum by the New Jersey Supreme Court that failure to insist on a financially-responsible independent contractor will subject the employer of that contractor to liability to uncompensated victims for the contractor's negligence. This endeavor is a perplexing one, but it is not one this court is free to avoid. In the course of discharging our obligation, we must choose either to reject or to accept a nascent legal rule, and thus risk distorting state law as much by an excess of conservatism as by insufficient attention to *stare decisis.*

### A.

On August 31, 1972, appellant Gary Becker, a 19-year-old construction worker, was

severely injured on his job site in Windsor, New Jersey when a heavy truck drove squarely over his pelvis.[1] Mr. Becker has sued to recover his damages, including the $35,000 in medical fees he had expended as of the time the complaint was filed.

The owner and general contractor of the $1.5 million shopping center project on which Mr. Becker was working at the time of the accident was I. P. Construction Corp. (hereinafter the developer).[2] Mr. Becker was employed by Wood-Pine Corp., a small company hired by the developer to pave the shopping center. The developer knew, or should have known, that Wood-Pine would hire subcontractors, since Wood-Pine itself had no trucks. In fact, Wood-Pine hired Windsor Contracting Corp., whose employee, Willard Edwards, drove the truck which injured Mr. Becker.[3]

There is evidence to indicate that I. P., at least on some occasions in the past, had required insurance coverage from its subcontractors (395a, 408a–411a). Also, there is evidence that the standard liability insurance coverage in the construction industry allows for recoveries of up to $250,000 per accident. In contrast, Windsor's automobile liability insurance coverage was only $10,000, and Windsor is only minimally capitalized.

To recover for his injuries in this diversity action, Mr. Becker sued Windsor and its employee for negligence, also asserting claims against the developer. Mr. Becker contends that he will be unable to recover his damages from Windsor because of Windsor's limited insurance coverage and marginal capitalization, and that the developer breached its duty in allowing such a financially-irresponsible contractor to be hired.

The district court granted summary judgment for the developer, holding that under New Jersey law the developer could not be held liable for the tort of an independent subcontractor regardless of the financial status of such subcontractor. It is this conclusion that we review here.[4]

### B.

Inasmuch as no New Jersey cases are squarely on point, it is important to make clear that our disposition of this case must be governed by a prediction of what a New Jersey court would do if confronted with the facts before us.[5] Such an estimate cannot be the product of a mere recitation

---

1. Since this case is before us on appeal from a summary judgment, all evidence in the record must be construed in the light most favorable to Mr. Becker, the appellant.

2. I. P. Construction is a wholly-owned corporate subsidiary of Interstate Properties, the owner of the property upon which the shopping center was being constructed.

3. Provisions of the agreement between I. P. and Wood-Pine require I. P.'s written approval of any subcontract let by Wood-Pine for work at the shopping center. (460a ¶ 13) There is evidence to indicate that I. P. in the past, at least on some occasions, had required insurance coverage from its subcontractors (395a, 408a–411a).

4. Mr. Becker also advanced the contentions (1) that he was entitled to recovery as a third-party beneficiary of a contract between I. P. and Wood-Pine which required insurance coverage; and (2) that Raymond Keyes Engineers (a consulting engineer for the shopping center project) and Saul Silverman (the architect for the project) were liable for their failure to assure that all subcontractors on the project were properly insured. We affirm the trial court's rejection of both claims, and the dismissal of Keyes and Silverman as defendants.

5. E. g. *Huddell v. Levin*, 537 F.2d 726, 733 (3d Cir. 1976) ("This appeal requires us to predict how the New Jersey Supreme Court would react when presented with novel and difficult questions of tort law."); *Knapp v. North American Rockwell*, 506 F.2d 361, 367 (3d Cir. 1974) ("the rule we believe a Pennsylvania appellate tribunal would adopt if the case arose in the state courts"); *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.*, 499 F.2d 146, 147 (3d Cir. 1974) ("our assigned role is to predict, not to form state law"); *Wise v. George C. Rothwell, Inc.*, 496 F.2d 384, 387 (3d Cir. 1974) ("we are bound to apply the standard of care the Delaware Supreme Court would apply were it faced with the issue now before us"); *Quinones v. U. S.*, 492 F.2d 1269, 1273 (3d Cir. 1974) *quoting Gerr v. Emick*, 283 F.2d 293, 294 (3d Cir. 1960) ("our own determination of what the Pennsylvania Supreme Court would probably rule in a similar case"); *Hiller v. Franklin Mint*, 485 F.2d 48, 51 (3d Cir. 1973) ("the rule New York would apply if faced with this issue"). *See* Wright, *Law of Federal Courts*, § 58, 267–71 (3d ed. 1976); 1A *Moore's Federal Practice*,

of previously decided cases. Rather, as in any diversity case, a federal court must be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudications by the state courts.[6] A diversity litigant should not be drawn to the federal forum by the prospect of a more favorable outcome than he could expect in the state courts. But neither should he be penalized for his choice of the federal court by being deprived of the flexibility that a state court could reasonably be expected to show.[7]

The federal tribunal is thus obligated to follow the course that it expects New Jersey courts would adopt in similar circumstances.[8]

Because we are dealing here with a summary judgment, our analysis is limited to the inquiry of whether any state of facts reasonably inferable from the record could entitle the plaintiff to send the case to the jury under New Jersey law. Our disposition is also influenced by the reluctance which New Jersey courts have manifested to dismiss innovative tort claims without full development of facts at trial.[9]

### C.

It is true, as Mr. Becker suggests, that the concept of immunity of the employer of an independent contractor is in tension with the more general tort doctrine of *respondeat superior*, and that the former represents a judicial gloss on the latter.[10] Indeed some authorities have advocated the all-out abolition of the independent contractor immunity,[11] and one noted commentator has es-

---

¶ 0.309, 3323–3330 (2d ed.) and *id.* 125–130 (1976–77 Supp.) (collecting cases).

**6.** See *e. g. Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 205, 76 S.Ct. 273, 100 L.Ed. 199 (1955) (state court decision will be followed where "there appears to be no confusion in the Vermont decisions, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of Vermont judges on the question"); *id.* at 208–11, 76 S.Ct. at 280 ("As long as there is diversity jurisdiction, 'estimates' are necessarily often all that federal courts can make in ascertaining what the state court would rule to be its law" . . . "Law does change with times and circumstances and not merely through legislative reforms"). *Quinones v. United States,* 492 F.2d 1269, 1276–79 (3d Cir. 1974) ("spinning out applications of accepted precedents" in light of "rapid, if not revolutionary development in judge-made tort law of Pennsylvania courts"); Wright, *supra* note 5 at 269. ("Judge Frank [in *Cooper v. American Airlines Inc.,* 149 F.2d 355, 359 (2d Cir. 1945)] thought that the test for the federal judge was: What would be the decision of reasonable intelligent lawyers, sitting as judges of the highest New York court, and fully conversant with New Jersey jurisprudence? It now seems clear Judge Frank was right").

**7.** *See* Moore, *supra* note 5 at 3324; Wright, *supra* note 5 at 269–270.

**8.** *Commissioner v. Estate of Bosch,* 387 U.S. 456, at 465, 87 S.Ct. 1776, at 1783, 18 L.Ed.2d 886 (1965) ("The underlying substantive rule involved is based on state law and the states highest court is the best authority on its own law. If there be no decision by that court, then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of the courts of the state. In this respect, it may be said to be, in effect, sitting as a state court.")

We have taken serious notice of the determination by the trial court that New Jersey would not adopt the position which we set forth. Judge Fisher's views, of course as a member of the New Jersey bar with long experience are entitled to great weight. Nonetheless, since his analysis rested solely on general policy and out-of-state cases, we do not believe the trial judge's views bind us.

**9.** *See e. g. Jackson v. Muhlenberg Hospital,* 53 N.J. 138, 249 A.2d 65 (1969); *Linn v. Rand,* 140 N.J.Super. 212, 356 A.2d 15 (App.Div.1976); *Bennett v. T&F Distributing Co.,* 117 N.J.Super. 439, 285 A.2d 59 (App.Div.1971).

**10.** *See* W. Prosser, *Handbook of the Law of Torts* 468–69 (1971); Note, *Risk Administration in the Marketplace; A Reappraisal of the Independent Contractor Rule,* 40 *U. Chicago L.Rev.* 661–664 (1973). Indeed, the early cases, both British and American, applied the doctrine of *respondeat superior* to independent contractors. *See Bush v. Steinman,* 1 Bos. & P. 404, 121 Eng.Rep. 978 (S.P.1799); *Lowell v. Boston 7 L.R. Corp.,* 23 Pick, Mass. 24 (1839).

**11.** Note, *Risk Administration in the Marketplace, supra* note 5 at 675–79 (suggesting joint liability of employer and contractor with indemnification agreements allowed); *cf.* Calabresi, *Some Thoughts on Risk Distribution and the Law of Tort,* 70 *Yale L.J.* 499, 545 (1960) (applicability of independent contractor exception should be "narrower"); Morris, *Torts of*

poused the view that the proliferation of exceptions to the immunity precept is "sufficient to cast doubt on the validity of the rule." [12]

Nonetheless, we discern no indication that the New Jersey courts are prepared to abandon on a wholesale basis the rule of an employer's immunity for the acts of his independent contractors and to adopt a pure theory of "enterprise liability." Instead, the New Jersey courts have adhered to the general doctrine of immunity, and the liability of employers has emanated from the exceptions articulated in *Majestic Realty Associates Inc. v. Toti Contracting Co.*[13]

■ Under *Majestic*, an employer is responsible for the negligence of an independent contractor if one of three special circumstances is present:

(1) where the employer retains control over the aspect of the activity in which the negligence occurs;

(2) where the contractor employed is incompetent; or

(3) where the performance of the contract involves an inherently dangerous activity.[14]

The sharp conflict in the case at hand centers on Mr. Becker's contention that by hiring or permitting the hiring of Windsor—a contractor financially unable to respond in damages—the developer came within the second exception to the immunity rule. Mr. Becker places his reliance primarily on a passage from *Majestic* suggesting that, as a matter of distributive justice, an employer should be liable for the torts of financially-irresponsible contractors. A proper construction of that key passage is crucial to the outcome of this litigation.

### D.

In *Majestic,* the New Jersey Parking Authority hired Toti Contracting Co. as an independent contractor to demolish a building owned by the Authority. Toti's employees negligently allowed a part of the demolished building to collapse and to damage Majestic's adjoining property. In a unanimous opinion adjudicating Majestic's claim against the Parking Authority, the New Jersey Supreme Court began by articulating the general rule that employers are immune from liability arising out of the torts of their independent contractors, and set forth the general exceptions to the immunity concept that are adumbrated above. After eliminating the "control" exception as a factor in the case, the New Jersey Supreme Court discussed at length the argument that employing a financially-irresponsible contractor is tantamount to hiring one who is incompetent, and therefore comes within the second exception. The Court cited several commentators advocating such a rule,[15] and then noted that the principle had not been applied previously. Justice Francis went on to state for a unanimous court, albeit in what was characterized as "an incidental comment,":

> Inevitably the mind turns to the fact that the injured third party is entirely innocent and that the occasion for his injury arises out of the desire of the contractee to have certain activities performed. The injured has no control over or relation with the contractor. The contractee, true, has no control over the doing of the work and in that sense is also innocent of the wrongdoing; but he does have the power of selection and in the application of concepts of distributive justice perhaps much can be said for the view that a loss

*Independent Contractors,* 29 *U.Ill.L.Rev.,* 339 (1934) (applicability of exception should generally be limited to those not in a position to select responsible contractor, or where risk of harm from business is light).

**12.** Prosser, *supra* note 10 at 468. *See Pacific Fire Ins. Corp. v. Kenny Boiler and Mfg. Co.,* 201 Minn. 500, 503, 277 N.W. 226, 228 (1927) ("Indeed it would be proper to say that the rule

is now primarily important as a preamble to the catalog of its exceptions.").

**13.** 30 N.J. 425, 153 A.2d 321 (1959).

**14.** 30 N.J. at 430–35, 153 A.2d at 324–26.

**15.** *Majestic Realty, supra* 30 N.J. at 432, 153 A.2d at 324.

arising out of the tortious conduct of a financially irresponsible contractor should fall on the contractee.[16]

Imposition of liability under such circumstances is particularly appropriate, the Court said, in light of the ready availability of liability insurance, which is viewed as a normal cost of doing business in the construction industry.[17] Nonetheless, the issue was expressly reserved.

Since the financial-irresponsibility contention had not been raised in appellate briefs or at trial in *Majestic,* the New Jersey Court declined to rule on it. Instead it held the Authority liable on the ground that demolition constituted an "inherently dangerous" activity.

The initial step in our inquiry as to the probable reaction of New Jersey courts to the suggested financial-responsibility criterion must be an examination of the reception that has been accorded the *Majestic* dictum by the New Jersey judiciary. The *Majestic* court's suggestion of employer liability for hiring a financially-irresponsible contractor evoked a flurry of contemporaneous commentary, predominantly favorable.[18] Nonetheless, since its enunciation, the financial-responsibility test has not come before the New Jersey courts. We thus have no directly applicable precedent upon which to rely.

However, the New Jersey courts since *Majestic* have consistently acknowledged both the rule of immunity and its tripartite exceptions.[19] Indeed, the three most recently reported independent contractor decisions of the New Jersey appellate bench have held against employer immunity on somewhat novel grounds.[20] One of these cases, *Bennett v. T&F Distributing Co.,*[21] quoted *Majestic's* discussion regarding "distributive justice" *in extenso* as an authoritative exposition of the "policy considerations" upon which it based its decision.[22] It appears, therefore, that the *Majestic* dictum is regarded by a New Jersey court of statewide jurisdiction as persuasive, and that immunity for independent contractees is not an ironclad rule of New Jersey jurisprudence. We must therefore look to the more general principles which govern New Jersey

16. 30 N.J. at 432, 153 A.2d at 324–25.

17. 30 N.J. at 433, 153 A.2d at 325.

18. Cowan, *Reform in the Law of Torts,* 14 *Rutgers L.Rev.* 356, 369 (1960) ("If the contractee wants the benefit of a financially-irresponsible contractor, he ought not complain at the operation of the doctrine of *respondeat superior.*"); Morris, *Agency and Partnership, Id.* at 375, 378 ("significant advance," "great step forward"); Note, 9 *Catholic L.Rev.* 106, 107 (1960) ("not an unreasonable obligation"); *but see* Comment, *Should Financial Irresponsibility Theory Become a Reality,* 64 *Dick.L.Rev.* 305 (1960) (questioning advisability of carving another exception to the "fault" principle). *See also* Note, *Risk Administration in the Marketplace, supra* note 10 at 667–68.

19. *Rodrigues v. Elizabethtown Gas Co.,* 104 N.J.Super. 436, 250 A.2d 408 (App.Div.1969); *Csaranko v. Robilt, Inc.,* 93 N.J.Super. 428, 226 A.2d 43 (App.Div.1967); *Marion v. Public Service Elec. and Gas Co.,* 72 N.J.Super. 146, 178 A.2d 57 (App.Div.1962); *Wolczak v. National Electric Products Corp.,* 66 N.J.Super. 64, 168 A.2d 412 (App.Div.1961); *Araujo v. New Jersey Natural Gas Co.,* 62 N.J.Super. 88, 162 A.2d 299 (App.Div.), *cert. denied* 33 N.J. 328, 164 A.2d 380 (1960).

20. *Corleto v. Shore Mem. Hosp.,* 138 N.J.Super. 302, 350 A.2d 534 (Law Div.1975) (hospital potentially liable for allowing incompetent M.D. to use operating room. Citing *Majestic* for incompetent contractor doctrine); *Hill v. Newman,* 126 N.J.Super. 557, 316 A.2d 8 (App. Div.), *certif. denied* 64 N.J. 508, 317 A.2d 720 (1973) (contractor's apparent authority sufficient to allow suit against contractee; *Majestic* cited for general rule); *Bennett v. T. & F. Distributing Co.,* 117 N.J.Super. 439, 285 A.2d 59 (App.Div.1971) *certif. denied* 60 N.J. 350, 289 A.2d 795 (1972). (Summary judgment for defendant denied in action for assault by independent door-to-door salesman, where defendant contractee should have known that salesman had record of vicious propensities.) After this case was argued, counsel brought to our attention the cases of *Horton v. American Institute for Mental Studies,* 380 A.2d 1201 (Law.Div. N.J.Super.1977) and *Bortz v. Rammel,* 376 A.2d 1261, 151 N.J.Super. 312 (App.Div.1977), in which employers of independent contractors were exposed to liability on the basis of violations by the contractor of the New Jersey Construction Safety Act, N.J.Stat.Ann. 34:5–166 *et seq.* Those cases may establish still another exception to employer immunity.

21. *Supra* note 20.

22. 117 N.J.Super. 444–45, 285 A.2d at 62.

courts in their exposition of common law doctrines.

### E.

In applying the common law, the New Jersey courts have been sensitive to the considerations of substantive policy which must temper the doctrine of *stare decisis.* As the New Jersey Supreme Court specifically declared in *Immer v. Risko* : [23]

> The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice.

The flexible approach set forth in *Immer* has been particularly evident in the area of tort law, where New Jersey courts have been notably willing to reexamine and modify traditional doctrine.[24]

This case brings before us a young construction worker whose body has in all probability been ruined for life. Yet, he is denied all but nominal recovery against the subcontractor who is responsible for his injury because that subcontractor is effectively judgment-proof[25] and was not required by the developer to carry standard insurance.[26] In such a situation, we believe the goals of New Jersey tort law in three areas would impel a New Jersey court to hold that the failure to engage a properly solvent or adequately insured subcontractor is a violation of the duty to obtain a competent independent contractor.[27]

First, the New Jersey courts have manifested a concern in their formulation of tort law to ensure that the burden of accidental loss be shifted to those best able to bear and distribute that loss rather than having it imposed on the hapless victim.[28]

**23.** 56 N.J. 482, 487, 267 A.2d 481, 484 (1970) *quoting Long v. Landy,* 35 N.J. 44, 50–51, 171 A.2d 1, 4 (1961). The court in *Immer* applied this doctrine as a warrant to "determine whether the reasons behind [inter-spousal] immunity are present in the case before us." It concluded that such immunity was inappropriate.

**24.** *See, e. g. Linn v. Rand,* 140 N.J.Super. 212, 218, 356 A.2d 15, 17 (App.Div.1976) ("[O]ur goal is to do substantial justice in light of the mores and needs of our modern day life;" citing cases in which this goal required reexamination of common law doctrines). *Cf. Collopy v. Newark Eye and Ear Infirmary,* 27 N.J. 29, 42, 141 A.2d 276, 283 (1958) ("It should be borne in mind that we are not dealing with property law or other fields of the law where stability and predictability may be of the utmost concern. We are dealing with the law of torts, where there can be little if any justifiable reliance and the rule of *stare decisis* is admittedly limited.") (eliminating charitable immunity to tort suit).

**25.** Windsor's owner estimated its net worth at the time of the accident to be "a couple of thousand dollars," since its equipment was wholly financed. (113a).

**26.** In his deposition, Saul Silverman, the architect in charge of the construction site, described an insurance coverage of $10,000 as "ridiculous."

**27.** It is true that *Majestic* involved a suit against an employer for the tort of his contractor, rather than a suit against an employer for the tort of his contractor's subcontractor, as here. As noted above, however, I. P. retained authority over the choice of subcontractors by Wood-Pine; any subcontract required specific authorization by I. P. *See* note 3 *supra.* Thus, if Wood-Pine breached a duty in choosing its subcontractor, I. P. is chargeable with Wood-Pine's negligent choice of a subcontractor under the standard tort doctrine that retention of control by the employer of an independent contractor subjects the employer to liability. *See Majestic Realty Associates v. Toti Contracting Co.,* 30 N.J. 425, 430, 153 A.2d 321, 324 (1959), Prosser, *supra* note 10 at 469.

**28.** In *Collopy v. Newark Eye and Ear Infirmary, supra* 27 N.J. at 34, 141 A.2d at 282, the New Jersey Supreme Court cited the explanation of Professors Harper and James, 2 *The Law of Torts,* 1669 (1956) as the "true ground of vicarious liability in our law." That work interprets the "true justification" for vicarious liability to be "its tendency to provide compensation for the innocent victims of an enterprise and to distribute the burden of these losses broadly through the persons or institutions engaged in that enterprise." *See Calabresi, supra* note 10, at 517–545; Comment, *Responsibility for the Torts of an Independent Contractor,* 39 *Yale L.J.* 861, 871–73 (1930) (suggesting that a "desire to assure compensation" is at the root of *respondeat superior* and exceptions to the general independent contractor rule).

In holding a mass-housing developer liable for a dangerously constructed hot-water heater in one of the homes he built, for example, the New Jersey Supreme Court placed great weight on the fact that "the builder-vendors are admittedly in a much better position than the injured party to absorb the crippling losses caused by their own . . . defective construction." [29] Similarly, in declaring that an implied warranty of fitness is deemed to be a part of an automobile leasing agreement, the New Jersey Supreme Court stated that warranties of fitness are regarded as an incident of a transaction in part "because one party to the relationship is in a better position than the other to . . . distribute losses which may occur because of a dangerous condition of the chattel." [30]

In this case, as in any case in which a financially-irresponsible contractor is hired, the choice of the party to bear the loss falls between the developer and the victim. Where, as here, the developer is a substantial entrepreneur and a member of an industry that carries large liability insurance policies as a matter of course, there is little question but that he is in the better position to bear the loss of such an accident.[31] Moreover, the developer can spread the increased costs of insurance or liability to ultimate users of the project. It is only in rare circumstances that a victim will have a similar option. Thus in a context such as we have here the doctrine suggested in

---

**29.** *Schipper v. Levitt and Sons, Inc.,* 44 N.J. 70, 87, 207 A.2d 314, 323 (1965). *See id.* at 326 ("The public interest dictates that if such injuries do result from the defective construction the cost should be borne by the responsible developer . . . who is in a better position to bear the loss.")

**30.** *Cintrone v. Hertz Truck Leasing and Rental Service,* 45 N.J. 434, 446, 212 A.2d 769, 775 (1965). See *Wilson v. Fare Well Corp.,* 140 N.J.Super. 476, 356 A.2d 458 (App.Div.1976) (liability of successor corporation for defective product of original corporation), *citing with approval Knapp v. North American Rockwell,* 506 F.2d 361 (3d Cir. 1974) (successor company is in better position to absorb losses than injured party.)

The New Jersey courts have also used the lack of ability to bear and spread losses as a reason for not imposing liability. In *Magrine v. Krasnica,* 94 N.J.Super. 228, 227 A.2d 539, 545 (1967), *affd. per curiam* 100 N.J.Super. 223, 241 A.2d 637, *affd. per curiam* 53 N.J. 259, 250 A.2d 129 (1969), the court noted in denying a claim of strict liability against a dentist:

The "risk distributing theory" is a relevant consideration. But again, we must appreciate the context in which it has been applied in our cases. In *Henningson, Santor, Schipper* and *Cintrone,* it was considered in holding liable the manufacturer or lessor, who put the goods in the stream of commerce. Such a party may fairly be assumed to have substantial assets and volume of business and a large area of contacts over which the risk can be widely spread. . . . It is the "large-scale" enterprise which should bear the loss. . . . The impact of liability upon such a defendant is miniscule in comparison with that of (sic) an individual dentist or physician. . . .

**31.** At the time that the doctrine of non-liability for acts of independent contractors was formulated, insurance markets were not nearly as extensive or sophisticated as they are today. *See* Hall, *Contractors' Liability Insurance For Property Damage Incidental to Normal Operations—The Standard Coverage Problem,* 16 *Kansas L.Rev.* 181, 181–82 (1968) (contractor's standard liability insurance emerged in 1930s). Indeed, Professor Morris, *supra* note 11, suggested in 1934 that indemnity bonds be the primary method of assuring responsibility.

The New Jersey courts in other areas have been sensitive to the impact of the growth and availability of insurance upon the rationale for common law immunities. In *Immer v. Risko,* 56 N.J. 482, 489, 267 A.2d 481, 484 (1970), the court said:

[R]ealistically, it must be remembered when dealing with the question of conjugal harmony that today virtually every owner of a motor vehicle with a sense of responsibility carries liability insurance coverage. The presence of insurance militates against the possibility that the interspousal relationship will be disrupted, since a recovery in most cases is paid by the insurance carrier, rather than the defendant spouse.

Similarly, in *Collopy v. Newark Eye and Ear Infirmary, supra* note 24, the court stated that the availability of insurance had "undoubtedly been a factor" in the strong trend toward the rejection of charitable immunity, citing a previous concurring opinion that noted: "availability of insurance has obviated any threat that recoveries against charities would seriously deplete their funds and deprive communities of their benefits." 27 N.J. at 40, 141 A.2d at 282.

*Majestic* is indicated by the policies previously adopted by the New Jersey courts.[32]

▪ Second, it is a well-recognized principle of tort law that, where feasible, liability for an accident should be allocated to those in the best position to control the factors leading to such accidents.[33] Indeed, this is said to be the basis for the independent contractor exception to *respondeat superior*—the independent contractor is in a better position to control the work of his employees than is his employer.[34]

In the situation contemplated by the financial-irresponsibility exception, however, the loss must fall either upon the developer or upon the victim, for the subcontractor is by definition incapable of bearing it. In general, the developer has more control than the victim.

More importantly, however, in the context in which the *Majestic* dictum applies, two elements have conjoined to give rise to the loss before the Court: the negligence leading to an injury and the failure to assure the financial responsibility that would allow compensation for the damages flowing from such negligence.[35] While the developer might be in a disadvantageous position to control the negligent conduct, in a case such as this—where the developer has negotiated at length regarding the insurance coverage of his independent contractor—he is in an excellent position to assure the proper degree of financial responsibility. The doctrine suggested by *Majestic* places the costs of a failure to insure, and the consequent incentives, on the party in a superior position to evaluate and avoid such costs.[36]

In this connection it is in order to note the definition of legal duty adopted by the New Jersey Supreme Court in *Kahalili v. Rosecliff Realty Inc.*[37]

> [T]he standard of conduct laid down by the law is care commensurate with the reasonably foreseeable risk of harm, such as would be reasonable in light of the apparent risk.

Using *Kahalili* as an analogue, the question for the jury in this case, is whether the behavior of the developer in failing to obtain or to require adequate insurance was reasonable in light of the apparent risk that an individual seriously injured by one of its

---

**32.** Where the employer is likely to be impecunious, of course, different considerations come into play. Nothing but a rigid adherence to legal formalism, however, dictates that the same rule must govern the case of a private individual contracting for repairs on his house as applies to the relation between a commercial developer and his subcontractor.

Similarly, where the independent contractor is solvent, there is little a priori reason to believe that he, rather than the contractee is better able to bear and distribute losses. See Calabresi, *supra* note 11 at 545–46; Douglas, *Vicarious Liability and the Administration of Risk*, 38 Yale L.J. 584, 594–600 (1929) (Professor W. O. Douglas, later Justice Douglas).

**33.** E. g., *Cintrone v. Hertz Truck Leasing and Rental Service*, 45 N.J. 434, 446, 212 A.2d 769, 775 (1969) (warranty implied because lessor in a better position to know and control the condition of the chattel); *Santor v. A & M Karaguesian Inc.*, 44 N.J. 52, 64, 207 A.2d 305, 311 (1965) (strict tort liability for defective products stems from fact that purchasing public has no knowledge or opportunity to determine the quality of articles bought); *Magrine v. Krasnica, supra* note 25. 94 N.J.Super. 228, 232–35, 227 A.2d 539, 542–43 (1967) (analyzing New Jersey cases: strict liability applies where de-fendant created the danger, or possesses a greater capacity, or expertise to control, or discover defect); *Wilson v. Fare Well Corp.*, 140 N.J.Super. 476, 488, 356 A.2d 458, 458–59 (Law Div.1976) (holding buyer of corporation manufacturing defective product subject to products liability suit), *citing with approval Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir. 1974) (manufacturer's successor is in better position to gauge risks and costs of meeting them). *See e. g.* Posner, *A Theory of Negligence*, 1 J. Legal Stud. 29 (1972); Calabresi, *Toward a Test For Strict Liability in Torts*, 81 Yale L.J. 1055 (1972).

**34.** *See* Prosser, *supra* note 10 at 468; Douglas, *supra* note 32 at 600–601.

**35.** *See* Calabresi, *The Costs of Accidents*, 58–59 (1970).

**36.** *See* Morris, *supra* note 18 at 378 (suggesting this is the effect of the *Majestic* rule), *cf.* Harper and James, *supra* note 28 at 1364 n.12 (suggesting that "strategic position" of employer to take out liability insurance is one modern basis for *respondeat superior*).

**37.** 26 N.J. 595, 603, 141 A.2d 301, 305 (1968).

contractors would go substantially without compensation.

■ Third, the New Jersey courts have expressed the view that the costs of accidents should be borne by those who secure the benefit of the activities that engender the mishaps.[38] Where only one party is involved, a decision declining to insure carries with it an automatic penalty: unshielded liability to tort judgments. By hiring an independent contractor, however, without the rule suggested by *Majestic,* the developer could obtain the advantage of lowered operating costs (passed on to him by his contractor in the form of reduced prices) without liability for the decision to expose third parties to the risk of uncompensated losses.[39] This is particularly so where, as here, the subcontractor has effectively shielded himself from suit by incorporating several minimally financed business entities.[40]

The *Majestic* doctrine would impose costs of financial irresponsibility on parties who benefit from that irresponsibility. In this respect, also, such an approach seems fully at one with the goals of New Jersey law.

Disagreement by the dissent with our assessment of New Jersey policy leans heavily on two statutes. The first, the New Jersey Construction Safety Act, N.J.Stat. Ann. §§ 34:5–166 *et seq.,* was enacted after the *Majestic* decision. We have found no indication in legislative history that the New Jersey Legislature intended to reject Justice Francis' dictum in *Majestic.* Indeed, as the dissent notes, the Act expressly leaves the "burden of care ordinarily imposed by the common law" unaltered. § 34:5–177. In New Jersey, this wording cannot be said to connote the expectation of static adherence to precedent.[41]

The second statute relied on by the dissent, N.J.Stat.Ann. § 34:15–79, provides that contractors shall be liable for "compensation due" to employees of subcontractors when the subcontractors fail to carry mandatory workmen's compensation insurance. On its face, this statute would seem to suggest a concern on the part of the Legislature to insure that victims are reimbursed when injured by financially irresponsible subcontractors. Since that provision already had been adopted long before the 1938 revision of the statute, however, we do not read it to reflect the New Jersey Legislature's reactions to the position suggested by *Majestic* in 1959.

### F.

Admittedly, the few cases in other jurisdictions to have addressed the question directly do not support Mr. Becker's contention, and the *Majestic* dictum has yet to be

---

**38.** *Santor v. A. & M. Karaguesian Inc.,* 44 N.J. 52, 65, 207 A.2d 305, 308, 311 (1965) (strict liability in product liability case: "the obligation of the manufacturer thus becomes what in justice it ought to be—an enterprise liability . . . [whose purpose] is to insure that the cost of injuries or damage . . . is borne by the makers of the products who put them in channels of trade"); *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314, 325 (1965) (similar considerations apply to mass developer); *see* Prosser, *supra* note 10 at 468 (noting this position); Harper and James, *supra* note 28 at 1400 (adopting this position); Calabresi, *supra* note 11 at 500–507; Note, *Borrowed Servants and the Theory of Enterprise Liability,* 46 Yale L.J. 807, 813–815 (1967). It has been argued that forcing businesses to take account of the costs they impose on society in the form of accidents is necessary to promote economic efficiency. *E. g.* Calabresi, *supra* ; Note, *Borrowed Servants, supra.*

**39.** *See* Cowan, *supra* note 18 at 369 (lowered operating costs for failure to insure may be crucial in construction bidding): Note, *Risk Administration in the Marketplace, supra* note 10 at 676 (incentive to hire judgment proof contractors).

**40.** The record indicates that Pecan, the owner of Windsor, incorporated at least two entities to engage in the trucking business, and that the entities interchanged work schedules.

**41.** *See Immer v. Risko,* 56 N.J. 482, 485–87, 267 A.2d 481, 483 (1970) (holding that the New Jersey Married Persons Act providing that husband and wife were not enabled to "contract with, or to sue each other except as heretofore, and except as authorized by this chapter," "did not incorporate [inter-spousal] immunity, but rather the common law with its inherent capacity for change.") Two recent cases, however, read the Construction Safety Act to expand liability. *See* note 20 *supra.*

adopted outside of New Jersey.[42] However, in view of the strong policy considerations undergirding the *Majestic* reasoning, the cases from other jurisdictions rejecting it would appear to be neither dispositive nor even persuasive.

Attention should focus primarily on *Coleman v. Silverberg Plumbing Co.*,[43] and *Matanuska Electric Assn. Inc. v. Johnson*,[44] since they represent the only extensive judicial discussion of the issue aside from *Majestic*.[45]

*Coleman* is more clearly distinguishable. First, the claim which *Coleman* rejected was specifically identified by the California Court as an attempt to impose strict liability on contractees for failure to insist on workmen's compensation coverage by their contractor. Unlike the present case, no negligence was alleged, and the California Court apparently took the broad nature of the claim into account in refusing to accept it.[46] Second, the *Coleman* Court relied heavily on its obligation to defer to a 1918 case of the California Supreme Court that

declared unconstitutional a statute that imposed tort liability of precisely the sort contended for.[47]

In *Matanuska*, on the other hand, disposition of the claim rested squarely on an analysis of the policy opposing imposition of liability. The *Matanuska* Court, like the district court in this case, first based its opinion on an assumption that any liability rule enunciated would apply to all independent contractor situations. The court argued that most of those adversely affected by the proposed rule would be "salaried working men and wage earners of modest means." In general, it concluded, no spreading of costs would be accomplished by imposing liability.[48] The plaintiff, the *Matanuska* Court then noted, was not an uninvolved third party—as in most "incompetent contractor" cases—but was an employee of the uninsured contractor. As between the employee and the average, inexperienced contractee, the court stated, the employee may well have the better opportunity to evaluate the financial responsibility of a contractor.[49] And, although the *Mata-*

---

**42.** *Reid v. U. S.*, 421 F.Supp. 1244 (E.D.Cal. 1976) (no liability for failure to enforce workmen's compensation insurance requirement in the contract); *Hampton v. McCord*, 141 Ga. App. 97, 232 S.E.2d 582 (1977) (no liability for failure to require liability insurance of contractor); *Coleman v. Silverberg Plumbing*, 263 Cal. App.2d 74, 69 Cal.Rptr. 158 (1968) (no liability for failure to insure compliance by contractor with statutory obligation of obtaining workmen's compensation insurance); *Matanuska Elec. Assn. v. Johnson*, 386 P.2d 698 (Alaska 1963) (same). *See ALI, Restatement of Torts*, 2d, § 411 comment g (1965) (taking no position on the issue of liability for financially irresponsible contractors on the ground that not enough cases have been decided).

Professors Harper and James have observed that judicial recognition of the suggestion that financial responsibility should breach the wall of independent contractor immunity is scanty. *Harper and James, supra* note 28 at 1405, § 26.11. *See id.* n.25 (Supp.1968) (no further judicial acceptance). They manifest no hostility to such a recognition, however, particularly in view of their sharp questioning of independent contractor theory in relation to large enterprises. *Id.* at 1403.

Similarly, Dean Prosser sets forth, with apparent approval, the suggestion that "the insurance necessary to distribute the risk is properly a cost of [the employer's] business," although

he notes that American courts "have not gone so far." Prosser, *supra* note 10 at 468.

**43.** *Supra* note 42.

**44.** *Supra* note 42.

**45.** In *Hampton, supra* note 42, the Georgia Court of Appeals rejected a claim for liability under the *Majestic* dictum without discussion, merely citing the *Restatement*, and inexplicably, referring the reader to *Majestic. Reid* was a cursory application of *Coleman* as the authoritative statement of California law.

**46.** *Coleman, supra* note 42, 69 Cal.Rptr. at 162 n.7 and n.8, 165.

**47.** *Id.* 69 Cal.Rptr. at 163–65. The court also gave weight to the fact that the claim arose with relation to workmen's compensation insurance, which it noted was "of constitutional and statutory origin" and "are not deprived from common-law doctrines malleable to judicial reshaping."

**48.** *Matanuska*, 386 P.2d at 703, *supra* note 42.

**49.** *Id.* 386 P.2d at 702–03.

The Alaska court also noted that the legal requirement of workmen's compensation made it plausible to take the position that an employ-

*nuska* Court did not mention it, the employee may be in a position to extract higher wage payments for taking greater uninsured risks.

The first ground of analysis is applicable if the rule of law contended for is the elimination of all independent contractee immunity. However, the *Majestic* dictum contemplates no such rule, nor is one necessary to decide the present case. The principal defendant here is a large, sophisticated and well-financed general contracting corporation with extensive experience in an industry in which high-coverage insurance is a matter of trade practice. To say that it is negligent for such an entity to fail to take steps to assure the financial responsibility of its subcontractors does not inexorably require similar liability for modestly-financed individuals of limited business experience.

*Matanuska's* second point also is inapplicable here. In contrast to the situation contemplated by *Matanuska*, Mr. Becker was not an employee of an uninsured contractor. He was in no position to be aware of, and to bargain for, the relevant insurance coverage. Rather, he had been hired by a subcontractor who in turn employed the uninsured sub-subcontractor. And it cannot be said that a 19-year-old employee of a building subcontractor is in a better position to know of, and to comprehend fully, the degree of insurance coverage carried by a sub-subcontractor on the job than is a substantial and experienced housing developer.

No persuasive argument has been adduced by the cases that have declined to adopt the *Majestic* approach. Accordingly, it seems doubtful that a New Jersey court would give controlling weight to the decisions of tribunals of other states in the face of the considered reflections of its own Supreme Court.[50]

### G.

The three concerns of tort law outlined above—spreading costs, minimizing losses, assuring that an activity's risks are borne by its beneficiaries—will not always point in one direction. Often trade-offs among those considerations will be necessary. And frequently they will, themselves, conflict with other elements of a just and reasonable outcome.

But the case before us presents no occasion to face such difficulties.

When the objectives of spreading costs and ensuring victim compensation, the goal of encouraging action to minimize losses, and the end of placing the cost of risks upon those who profit from those risks are all served by a single doctrine, it would appear that such a precept would commend itself to the judiciary. When the effect of applying that doctrine is to assure the right of a tragically injured young person to have a day in court in which to seek recovery from a developer who failed to follow a trade practice which would have allowed compensation directly, I do not believe that application of that doctrine is at odds with intuitive notions of justice. When policy concerns and practical effect so merge to support a rule of law, and when no prior New Jersey case has rejected it, it seems reasonable to predict that such a rule would be adopted by the New Jersey courts.

### H.

The scope of our decision here must be clearly understood. We assume in this opinion, without deciding, that the plaintiff's allegations that Windsor is liable for

---

er was entitled to rely on compliance with the law.

Such an argument is inapplicable here. The New Jersey Legislature has left the obligation of contractors in this area to the development of the common law.

**50.** The dissent suggests that the principle advanced here will significantly limit the opportunities of independent contractors without

"start-up" capital. This seems unlikely because even a minimally capitalized business presumably will be able to bear insurance premiums as operating costs. Moreover, there is no evidence to indicate that New Jersey wishes to subsidize struggling construction contractors by depriving accident victims of compensation.

Mr. Becker's injuries are correct. This, of course, is ultimately a question for the jury. Likewise, we assume, as the plaintiff alleges, that Windsor will, in fact, be unable to respond to a damage award against it. This also is a matter for proof at trial.

█ Moreover, we take as given, on the basis of plaintiff's allegations and the record before us, that the developer's failure to require financial ability to meet damage awards was an unreasonable violation of a trade practice. Whether I. P.'s actions were at variance with trade practice in the construction industry, and whether those actions were unreasonable are additional matters for the jury to decide. Finally, under the *Majestic* dictum, I. P. would be liable only for the difference between the insurance which it actually required and the amount it would have been reasonable, in the light of trade practice, to expect. This amount, too, is a matter to be determined by the jury at trial.

The judgment of the district court will be affirmed in regard to defendants Raymond Keyes Engineers and Saul Silverman, *see* n.4 *supra*. The remainder of the judgment will be reversed and remanded for action in accordance with this opinion. No costs shall be taxed against any party to this appeal.

---

JAMES HUNTER, III, Circuit Judge, dissenting:

I respectfully dissent. The majority has, in my view, formulated a new duty in the law of torts, which until now has not been part of the law of any jurisdiction in this country. As we see it, this concept imposes liability upon a contractor for selecting a subcontractor who, though mechanically competent, is not sufficiently responsible financially. The majority's decision, in my belief, is not an apt prediction of what the New Jersey courts would hold had this case arisen within the state system.

The majority's statement of the principles by which a federal court, sitting in diversity, must determine an issue of state law not yet decided by the courts of that state is, of course, entirely correct. A federal court must make an informed estimate of what is the applicable state law when state precedent is unclear or incomplete with respect to an issue litigated before the federal court.[1]

Nevertheless, the majority's reliance on the *obiter dicta* in *Majestic Realty Associates, Inc. v. Toti Contracting Co.*[2] and on its perception of the relevant policies considered by the New Jersey courts leads this court to impose a duty on those who engage independent contractors which I feel that New Jersey courts would be most reluctant to apply. The language in *Majestic Realty*, enshrouded in *caveats* and encircled with disclaimers of precedential value, must be viewed as a discussion of an issue neither decided by the trial court in the case nor briefed by the parties on appeal. Rather, the issue arose as "an emanation of the oral argument." As the majority has pointed out, Justice Francis characterized the portion of this opinion dealing with financial irresponsibility of independent contractors as an "incidental comment" for which "no decision is rendered" and on which decision was "expressly reserved."[3]

In the eighteen years since the *Majestic Realty* opinion was rendered, the New Jersey courts have not responded to Justice Francis' query whether liability might be imposed on the landowner who hires a financially irresponsible independent contractor through whose negligence a third party is injured. As the majority acknowledges, other states have not taken this step and imposed liability on one so far removed, if not isolated, from the *physical cause* of the injury.

Certainly a federal court sitting in diversity should not mechanically follow precedent and blindly apply principles of *stare*

---

1. *See, e. g., Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 209, 76 S.Ct. 273, 100 L.Ed.2d 199 (1956) (Frankfurter, J., concurring).

2. 30 N.J. 425, 153 A.2d at 321 (1959).

3. *Id.* at 433, 153 A.2d at 325.

*decisis* when it appears that the corresponding state court would adjust its common law to meet changing conditions. At the same time, however, when no other court in this country has as yet broken from a traditional precept of the law, a federal court should proceed cautiously.

One important development in the law of New Jersey has been the advancements in the protection of the public from physical injuries by laws enacted by the legislature. In the construction industry, the state legislature has been active in defining standards of conduct by which construction sites can be made safer for employees on the site and the public. *See* New Jersey Stat.Ann. §§ 34:5–166 *et seq.*; New Jersey Admin. Code ch. 180.[4] These statutes and regulations have not gone so far as to impose upon developers or general contractors a duty of ensuring that subcontractors on a site be able to respond financially to tort claims arising out of their work. Rather, the legislature has sought to implement a policy of financial protection of workers on a construction project through New Jersey Stat.Ann. § 34:15–79, which states:

> . . . Any contractor placing work with a subcontractor shall, in the event of the subcontractor's failing to carry workmen's compensation insurance as required by this article, become liable for any compensation which may be due an employee or the dependents of a deceased employee of a subcontractor. The contractor shall then have a right of action against the subcontractor for reimbursement. . .

Consequently, it appears that the legislature has provided a standard by which the duty of a developer-general contractor to require financial ability to respond to injuries suffered by an employee of an independent subcontractor or sub-subcontractor can be measured. Since the legislature has taken the initiative in formulating the duty of a general contractor to insure that injuries sustained on the job will be covered by workmen's compensation, I am unwilling to predict that the New Jersey courts would add on the requirement that "adequate" insurance coverage or its equivalent (apparently beyond workmen's compensation) be extended to all employees on a construction site.[5]

Further, I have difficulty with the majority's formulation of the duty of a developer of land to take reasonable care that its independent subcontractors be able to respond financially, through insurance or otherwise, to claims for injuries suffered as a result of the contractor's negligence. The inexactitude of the standard for imposing liability arises since the majority limits the scope of the duty to include only those whose financial capabilities and business acumen are more than "modest."

To my knowledge, New Jersey courts have never defined the scope of a tort *duty* on the basis of an individual's financial capabilities. The majority's decision will, I think, cause uncertainty and doubt for every financial strata and every court, as well as hinder the employment opportunities of an independent contractor trying to enter the marketplace but lacking much in the way of start-up capital.

Behind this "duty" that the majority imposes lie significant policy questions relating to economic and social costs and bene-

---

**4.** The Construction Safety Act, New Jersey Stat.Ann. §§ 34:5–166 *et seq.*, was adopted after the New Jersey Supreme Court's decision in *Majestic Realty.* 1962 N.J. Laws c. 45. Consequently, the legislature's activity in this field seemingly would be considered by a reviewing New Jersey court as indicative of a desire by the legislature to regulate the duties of care imposed on those engaging in construction. The statute does note that the legislature did not intend to increase the burden of care required by the state's common law. New Jersey Stat.Ann. § 34:5–177. However, the pas-

sage of the Act and promulgation of regulations pursuant to that statutory authority supports the contention that the legislature intended to become involved in determining the scope of duty of construction contractors.

**5.** In this case, defendants I. P. Construction Corp. and Interstate Properties have been treated as one entity. Consequently, New Jersey Stat.Ann. § 34:15–79 would apply to I. P. as general contractor. Thus it appears that the legislature has acted to define the scope of the duty of these defendants in this regard.

fits. It appears to me that the New Jersey courts would look to the legislature for the determination of whether to adopt this novel aspect of tort law.

Certainly, the facts in this case are most compelling. However, I do not reach the conclusion that the New Jersey courts would decide the case in the manner in which the majority has determined. Thus I am unable to join in the court's opinion.

