39 A.3d 208 (2012)
424 N.J. Super. 566
STATE of New Jersey, New Jersey Department of Environmental Protection, Plaintiffs-Appellants,
v.
Thomas CULLEN, T.C. Management, Inc., Bennett Mohin, Cherokee Camden, L.L.C., and Cherokee Pennsauken, L.L.C., Defendants-Respondents.
Docket No. A-3001-09T1
Superior Court of New Jersey, Appellate Division.
Argued November 1, 2011.
Decided March 6, 2012.
*211 Jung W. Kim, Deputy Attorney General, argued the cause for appellants (Paula T. Dow, Attorney General, attorney; Melissa Raksa, Assistant Attorney General, of counsel; Ms. Kim and Kevin P. Auerbacher, Deputy Attorney General, on the brief).
Michael O. Hill (Hill & Kehne) of the New York and Washington, D.C. bar, admitted pro hac vice, argued the cause for respondents Cherokee Pennsauken, L.L.C. *212 and Cherokee Camden, L.L.C. (Sokol, Behot & Fiorenzo, and Mr. Hill, attorneys; Neil Yoskin, Princeton, of counsel and on the brief).
Christina N. Burgos argued the cause for respondents Thomas Cullen and T.C. Management, Inc. (Ginsberg & Burgos, P.L.L.C., attorneys, join in the brief of respondents Cherokee Pennsauken, L.L.C. and Cherokee Camden, L.L.C.).
Before Judges YANNOTTI, ESPINOSA and KENNEDY.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
Plaintiff State of New Jersey, Department of Environmental Protection (DEP), filed a complaint in the Law Division against defendants Thomas Cullen (Cullen), T.C. Management, Inc. (TCM), Bennett Mohin (Mohin), Cherokee Camden L.L.C. and Cherokee Pennsauken, L.L.C. (collectively, Cherokee), alleging that they violated the Endangered and Nongame Species Conservation Act (ENSCA), N.J.S.A. 23:2A-1 to -15. The DEP claimed that defendants violated ENSCA because Cullen and Mohin harassed bald eagles living on Petty's Island.
The DEP appeals from the trial court's order of November 19, 2008, denying its motion for an adverse inference due to spoliation of evidence. The DEP also appeals from an order entered by the trial court on January 14, 2010, granting summary judgment in favor of defendants, and denying the DEP's cross-motion for summary judgment. For the reasons that follow, we affirm in part, reverse in part and remand the matter to the trial court for further proceedings.

I.
This dispute arises from the following facts. Petty's Island is located in the Delaware River, near Camden and consists of about 300 acres. Citgo Petroleum Corporation (Citgo) owns the island, which is connected to the New Jersey mainland by a vehicular bridge. A fuel oil tank farm is located on the island. Since at least 2003, the island has been the nesting site for a pair of bald eagles. Cherokee is a company that invests in the redevelopment of brownfield sites.[1] Cherokee intended to clean up the contaminants on Petty's Island and redevelop the property.
In January 2004, Cherokee contacted Cullen and Cullen attended a meeting with a Cherokee representative and others at a law firm to discuss whether the island could be redeveloped if the eagles were living there. Cullen apparently has had some experience with birds of prey. Another meeting took place at the law firm in February 2004. Cullen said that the meeting focused on the proposed development and the taking of soil samples.
After that meeting, a representative of the United States Fisheries and Wildlife Service (USFWS) told Cullen that there was no established federal protocol for monitoring bald eagles and Cullen should contact the DEP. Cullen claimed that he made several attempts to contact Lawrence Niles (Niles), chief of the DEP's Endangered and Nongame Species Program, but was not able to speak with him.
In March 2004, Cherokee entered into a contract with TCM, Cullen's company, to monitor the behavior of the eagles on Petty's Island. According to the contract, *213 TCM would provide thirty-two hours of monitoring per week for about five months. The monitoring program was to include experienced personnel trained to identify the behavior of eagles. The agreement stated that "Monitoring Protocols have been set with consultation with [the DEP] Fish and Wildlife Service personnel."
The agreement also stated that monitoring of the eagles was to take place from fixed points of observation. Reports would be completed for each shift, and monitors were to record data every thirty minutes. All observed movements were to be recorded. The monitoring would coincide with the natural breeding behavior of the eagles and would note behavior of interest such as tolerance to disturbances, food preferences and roosting sites. TCM agreed to produce a summary report of its monitoring activities after they were completed.
Cullen hired Mohin to monitor the eagles. Mohin was nineteen-years old at the time. It appears that Mohin had previously accompanied Cullen on hunting trips using birds of prey. Mohin also had taken a course in falconry but never observed bald eagles. Before the start of the monitoring program, Cullen told Mohin that he should avoid disrupting the eagles.
According to Cullen's final report, the monitoring began on March 12, 2004. Cullen selected the observation points. Mohin observed the activities of the eagles using a range finder and a telescope. He recorded his observations in a log book and noted on a map the places where he saw the eagles. Mohin phoned Cullen and updated him on the movements he observed.
Mohin worked on the monitoring project seven days a week, about seven hours a day, for fifteen weeks, under Cullen's supervision. He made observations at dawn or dusk, when the eagles were most active. Cullen and Mohin claimed that the monitoring took place primarily from the New Jersey and Pennsylvania shorelines, but sometimes Cullen directed Mohin to go onto the island.
Mohin and/or Cullen went to the island twenty-one times, nineteen times by car and twice by a kayak. Mohin stated that he never left his car on the occasions he drove onto the island. Mohin also made observations fifteen times from a kayak without actually setting foot on the island. At one point, Mohin's kayak approached within fifty yards of one of the eagles, and the eagle flew away.
Mohin denied approaching the tree where the eagles' nest was located. He observed the eagles bringing food to the nest but did not see an eaglet. He claimed that typically there was truck activity on the island about every ten to twenty minutes. According to Cullen, workers from the oil tank farm came within several hundred yards of the eagles from time to time.
While the monitoring program was underway, Niles and his deputy, Kathleen Clark (Clark), placed a two-week old eaglet in the Petty's Island nest. Niles was concerned that nests north and south of Petty's Island were showing signs of environmental contamination. Niles and Clark wanted to see what would happen when a newly-hatched eaglet was placed in the nest. A DEP volunteer checked the site in late May of 2004 and noted that the eaglet was doing well.
On or about May 27, 2004, Cullen and Mohin brought a six by seven foot camouflaged tent to the island and erected it about 200 feet from the nest. Mohin said that they placed the tent on the island because the growth of the island's vegetation made it difficult for him to observe the nest from the shore. Cullen said that when he and Mohin selected the site for *214 the tent, they remained on the island about fifteen minutes. A DEP volunteer checked the site on June 4, 2004, and found no sign of the eagles or the eaglet.
On June 10, 2004, the eaglet was found injured along a roadway on the island. Niles and Clark went to the island that day to retrieve it. The bird was lying between the road and the nesting tree. Niles maintained that the bird died shortly thereafter from poor nutrition, the effects of a puncture wound and a broken bone.
When Mohin returned to the island on June 16, 2004, he found the tent about ninety-four feet from the nest. The tent had apparently been moved in a storm. Mohin moved the tent back to its original location. This visit to the island lasted about fifteen minutes. According to Cullen, Mohin did not observe any activity in the nest that day and told him that something was wrong. On June 21, 2004, Mohin and Cullen went to the tent but did not observe any activity in the nest. Cullen had Mohin remove the tent the following day.
Cullen said that the monitoring of the eagles ended on June 26, 2004, after 480 hours of observation and 108 sightings. In his final report dated July 12, 2004, Cullen stated:
Due to the location of the nest site it is expected that the eagles on Petty's Island would have a high tolerance toward human related activities. During the course of monitoring the movements of the eagles in and around Petty's Island, T.C. Management staff had the opportunity to observe a variety of situations in which the eagles ignored human activities.
The activities noted included vehicular activity, boat traffic on the river and persons walking.

II.
On March 3, 2005, the DEP filed a complaint against Cherokee, TCM and Cullen, alleging that they violated ENSCA as a result of the harassment of the eagles. The DEP later filed the first amended complaint with additional allegations, and a second amended complaint naming Mohin as a defendant. Before the second amended complaint was filed, defendants filed motions to dismiss the amended complaint pursuant to Rule 4:6-2(e) for failure to state a cause of action.
The motion judge considered the motions on May 12, 2006, and placed his decision on the record. The motion judge rejected defendants' contention that the term "harass" as used in ENSCA was vague. The judge stated that "the harassment that we're talking about is as the [DEP] defines it" and it involves "annoyance, irritation, [or] disturbance[.]"
The judge additionally stated that "harassment" under ENSCA requires an activity which "affects the behavior of wildlife," and "disturbs, alarms, disrupts or annoys the wildlife." The judge determined that the DEP had alleged sufficient facts in its complaint to suggest that Cullen harassed the eagles in violation of ENSCA.
The judge also determined that the DEP had alleged sufficient facts to support a claim against Cherokee. The judge observed that the DEP claimed that Cherokee knew or should have known that the actions Cullen was undertaking could constitute harassment or an attempt to harass. The judge accordingly entered an order dated May 12, 2006, denying defendants' motions to dismiss.
During the discovery period that followed, the DEP filed a motion seeking an adverse inference based on spoliation of evidence, specifically Cullen's failure to *215 preserve Mohin's daily log sheets. Because the motion judge had retired, another judge assumed responsibility for the case and conducted an evidentiary hearing on the DEP's motion.
The court placed its decision on the record on November 3, 2008. The court found that the DEP had not shown that there was anything prejudicial to defendants or helpful to the DEP in Mohin's log sheets. The court noted that the DEP did not demand the logs until 2007, and prior to that time Cullen had not been aware that the log sheets were of "any special importance[.]" The court observed that Cullen had not destroyed the notes, rather, the notes were apparently "lost along the way."
The court concluded that, under these circumstances, it would not be appropriate to draw an adverse inference against Cullen or TCM as a result of the loss of the notes. The court also concluded that an adverse inference against Cherokee was not warranted because Cherokee did not have the notes or control them. The court entered an order dated November 19, 2008, denying the DEP's motion.
In April 2009, Cherokee filed a motion to dismiss the complaint for failure to state a claim or, alternatively, for summary judgment. Cullen, TCM and Mohin also filed motions for summary judgment. The DEP opposed the motions and filed a cross-motion for summary judgment.
On December 24, 2009, the court placed its decision on the record. The court rejected the motion judge's interpretation of ENSCA and said that in order to establish harassment, the DEP had to prove that a person annoyed an endangered species to such an extent that it significantly disrupted its normal behavioral patterns, thereby creating a likelihood of injury. The court determined that the DEP had not presented sufficient evidence to establish Cullen, TCM or Mohin had harassed or attempted to harass the eagles in this manner.
The court also determined that DEP's claim against Cherokee failed as a matter of law because ENSCA did not encompass a claim for negligent attempt to harass, and there was no evidence to show that Cherokee had intentionally attempted to harass the eagles by hiring Cullen to monitor them. In addition, the court determined that the evidence was insufficient to impose vicarious liability upon Cherokee for Cullen's or Mohin's actions.
The court entered an order dated January 14, 2010, granting summary judgment in favor of all defendants and denying the DEP's cross-motion for summary judgment. This appeal followed.

III.
We turn first to the DEP's contention that the law of the case doctrine required the trial court to adhere to the motion judge's determinations that Cherokee was required to obtain a DEP protocol for its monitoring program, monitoring of eagles is not permitted during breeding season, and ENSCA allows a claim for negligent attempt to harass an endangered species. We disagree.
The law of the case doctrine provides "that a legal decision made in a particular matter `should be respected by all other lower or equal courts during the pendency of that case.'" Lombardi v. Masso, 207 N.J. 517, 538, 25 A.3d 1080 (2011) (quoting Lanzet v. Greenberg, 126 N.J. 168, 192, 594 A.2d 1309 (1991)). The doctrine "is a non-binding rule intended to `prevent relitigation of a previously resolved issue.'" Ibid. (citing In re Estate of Stockdale, 196 N.J. 275, 311, 953 A.2d 454 (2008)).
*216 However, "[a] hallmark of the law of the case doctrine is its discretionary nature, calling upon the deciding judge to balance the value of judicial deference for the rulings of a coordinate judge against those `factors that bear on the pursuit of justice and, particularly, the search for truth.'" Id. at 538-39, 25 A.3d 1080 (quoting Hart v. City of Jersey City, 308 N.J.Super. 487, 498, 706 A.2d 256 (App. Div.1998)).
As we have noted, the motion judge's decisions were rendered on Cherokee's motion to dismiss under Rule 4:6-2(e). In deciding those motions, the judge was called upon to determine whether the facts as alleged by the DEP in its complaint stated claims upon which relief could be granted. Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989).
Thereafter, Cherokee again moved to dismiss under Rule 4:6-2(e). In support of that motion, however, Cherokee relied upon evidential materials outside the pleadings. Therefore, the trial court properly treated the motion as one for summary judgment. R. 4:6-2. Indeed, in addition to seeking dismissal of the complaint pursuant to Rule 4:6-2(e), Cherokee alternatively sought summary judgment, as did the other defendants.
Thus, the trial court applied a standard in deciding the summary judgment motions that was different from the standard that the motion judge applied in deciding the earlier Rule 4:6-2(e) motion. In doing so, the court based its decision not upon facts as alleged in the complaint but rather upon evidence developed during discovery. The court was not bound to adhere to the motion judge's preliminary assessment of the facts. Furthermore, the court was not required to follow the motion judge's interpretation of the relevant section of ENSCA if the court believed that the interpretation was clearly erroneous.
We therefore conclude that the court did not abuse its discretion by reconsidering the motion judge's earlier decisions in the case.

IV.
We turn to the DEP's contention that the trial court erred in its construction of the word "harass" in ENSCA. Again, we disagree.
ENSCA provides in pertinent part that no person may "take" a "species or subspecies of wildlife" that the DEP has declared to be endangered. N.J.S.A. 23:2A-6. The Commissioner of the DEP has determined that the bald eagle is an endangered species. N.J.A.C. 7:25-4.13(b)(8). The word "take" is defined in ENSCA to mean "to harass, hunt, capture, [or] kill," or to attempt to do the same. N.J.S.A. 23:2A-3(e).
When interpreting a statute, our task "is to determine and effectuate the Legislature's intent." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553, 964 A.2d 741 (2009). In doing so, "`we look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen.'" Ibid. (quoting Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 264, 952 A.2d 1077 (2008)).
Where, as here, ENSCA and the regulations promulgated thereunder are silent as to the meaning of the word "harass," a court may look to analogous provisions of federal law for guidance. In re Cnty. of Morris v. Morris Council No. 6, 371 N.J.Super. 246, 255, 852 A.2d 1126 (App. Div.2004), certif. denied, 182 N.J. 427, 866 A.2d 984 (2005). Under the federal Endangered Species Act (ESA), 16 U.S.C.A. *217 § 1531 to -1544, the term "take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C.A. § 1532(19).[2]
In addition, federal regulations define the term "harass," as used in the ESA, as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3(c).
Here, the trial court interpreted "harass" in ENSCA in accordance with the federal regulatory definition and rejected the motion judge's view that the word should be defined to mean actions that annoy persistently, an interpretation drawn from a dictionary definition of the word "harass." See Webster's Third New International Dictionary 1031 (1981) (defining "harass" as "to vex, trouble, or annoy continually or chronically").
The trial court reasoned that the Legislature could not have intended the latter interpretation because it would subject birdwatchers, campers, scouts, boaters and others to penalties if they venture near endangered species. We agree with the trial court that the Legislature did not intend for the term "harass" as used in ENSCA to be interpreted in this manner.
Furthermore, as the trial court noted, the word "harass" is part of the definition of "take" in ENSCA, a term that also includes hunting, capturing and killing. N.J.S.A. 23:2A-3(e). The coupling of words in a statute indicates that the Legislature intended that they be understood in the same general sense. State v. Sisler, 177 N.J. 199, 206, 827 A.2d 274 (2003). Indeed, the meaning ascribed to words in a statute "may be indicated, controlled, or made clear by the words with which [they are] associated." In re Stream Encroachment Permit, 402 N.J.Super. 587, 955 A.2d 964 (App.Div.2008) (citing Falcone v. Branker, 135 N.J.Super. 137, 146-47, 342 A.2d 875 (Law Div.1975)).
We are therefore convinced that the Legislature intended that the word "harass" be interpreted and understood in the same general sense as the other statutory definitions of "taking" in ENSCA. In our view, the federal regulatory definition better reflects the Legislature's intent in ENSCA. We therefore conclude that the word "harass" as used in ENSCA means an intentional or negligent act which creates the likelihood of injury to an endangered species by annoying the species to such an extent as to significantly disrupt its normal behavioral patterns.

V.
We next consider the DEP's contention that the trial court erred by granting summary judgment in favor of Cullen, TCM and Mohin, and by denying its motion for summary judgment against the parties.
Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving *218 party, would require submission of the issue to the trier of fact." R. 4:46-2(c).
Here, the trial court found that, even when viewed in a light favorable to the DEP, the evidence would not support a finding that any defendant, individually or collectively, harassed or intended to harass the eagles on Petty's Island. We are convinced, however, that the DEP presented sufficient evidence to raise a genuine issue of fact as to whether Cullen, TCM and Mohin harassed the eagles in violation of ENSCA.
In this case, the DEP maintains that the evidence concerning placement of the tent on the island near the eagles' nest, the tent's movement during the storm, and Cullen's and Mohin's visits to the island shows that Cullen's and Mohin's actions constitute harassment under ENSCA. The DEP claims that these actions caused the eaglet to leave the nest prematurely and also caused the other eagles to leave the nest.
Defendants contend that the DEP failed to establish that the aforementioned actions caused these outcomes. Defendants note that Petty's Island is an industrial site, with helicopters landing from time to time, truck traffic, and boats arriving and departing. They contend that the eagles have been subjected to far more human activity than is alleged to have occurred in this matter. We are satisfied, however, that the DEP's evidence supports a reasonable inference that Cullen and Mohin annoyed the eagles to such an extent so as to significantly disrupt their normal behavioral patterns, thereby creating a likelihood of injury.
Defendants also contend that the evidence before the trial court established that Cullen's and Mohin's actions were not the cause of the eaglet's death. In support of this argument, Cherokee submitted an affidavit to the trial court from James P. Ludwig (Ludwig), Ph.D, a consulting ecologist with a specialty in avian toxicology. Ludwig asserted that the DEP's decision to move the eaglet to the island placed it in "grave danger" because the island is "highly contaminated." Ludwig said that the necrology report indicated that the eaglet died from acute maggot infestation and trauma. He stated that the infestation "probably began well before the eaglet" left the nest on Petty's Island.
Ludwig additionally noted that toxicological tests established a high probability that the eaglet's exposure to dioxin-like polychlorinated biphenyls (PCBs) and polybrominated diphenyl ethers (PBDEs) contributed to the its death. Ludwig stated that the severe maggot infestation was likely the most important acute cause of the eaglet's death, and the infestation was likely exacerbated by exposure to PCBs, PBDEs and other toxicants "at levels sufficient to suppress" the eaglet's immune function.
Ludwig's affidavit raises a genuine issue of material fact as to the cause or causes of the eaglet's death. The affidavit does not, however, address the question of whether Cullen's and Mohin's actions significantly disrupted the eagles' normal behavioral patterns, thereby causing the eaglet to leave the nest prematurely and causing the other eagles to leave the nest.
We therefore conclude that the evidence presented by the DEP raised a genuine issue of material fact as to whether Cullen, TCM and Mohin violated ENSCA by harassing the eagles on Petty's Island, and summary judgment should not have been granted in favor of Cullen, TCM and Mohin. For the same reason, we conclude that the DEP was not entitled to summary judgment on its claims against these defendants.

*219 VI.
The DEP additionally argues that the trial court erred by granting Cherokee's summary judgment motion and by denying its motion for summary judgment.
As we stated previously, the DEP alleges that Cherokee violated ENSCA by "attempting to harass an endangered species" when it hired Cullen and TCM to monitor the eagles' tolerance to human disturbance on the island. The DEP further alleged that Cullen did not have the requisite expertise or experience to undertake the eagle monitoring program.
The trial court determined that ENSCA does not allow penalties to be imposed for a negligent attempt to harass an endangered species. The court also determined that the evidence failed to establish that Cherokee intentionally attempted to harass the eagles by hiring Cullen to monitor the eagles. The court noted that there was no evidence that Cherokee had any reason to believe that Cullen would harass the eagles in a manner prohibited by ENSCA.
The court also stated that the DEP had not specifically alleged in its complaint that Cherokee was vicariously liable for Cullen's, TCM's and Mohin's alleged harassment of the eagles. The court stated that even if the complaint could be read to encompass such a claim, there was no evidence to support it.
On appeal, the DEP does not argue that the trial court erred by determining that ENSCA does not permit a claim for a negligent attempt to harass an endangered species. The DEP also does not challenge the court's determination it failed to present sufficient proof to show that Cherokee intentionally attempted to harass the eagles.
The DEP does, however, argue that the trial court erred by finding its complaint did not set forth a claim against Cherokee for vicarious liability. We agree. Although the DEP did not explicitly allege that Cherokee was vicariously liable for Cullen's and Mohin's alleged harassment of the eagles, such a claim is implicit in its complaint.
The DEP further argues that the trial court erroneously found that it had not presented sufficient evidence to support a claim against Cherokee for vicarious liability. The DEP maintains that the court should have denied Cherokee's motion for summary judgment and granted summary judgment in its favor.
Ordinarily, a principal is not liable for the negligent acts of its independent contractor. Majestic Realty Assocs., Inc. v. Toti Contracting Co., Inc., 30 N.J. 425, 430-31, 153 A.2d 321 (1959). A principal may, however, be liable for such acts if it: 1) retains control over the manner and means of the work to be performed; 2) hires an incompetent contractor; or 3) the work involved constitutes a nuisance per se. Ibid. The DEP argues that Cherokee is liable here because it controlled Cullen's monitoring activities, Cullen was not a competent contractor and the alleged harassment of the eagles should be considered a nuisance per se.
We are satisfied that the DEP presented sufficient evidence to support a claim against Cherokee on the basis of its control over Cullen's monitoring program. To determine whether a principal is liable on this basis, the trier of fact must consider various factors, including "the extent of control . . . the [principal] may exercise over the details of the work;" whether the contractor "is engaged in a distinct occupation or business;" the "skill required in the particular occupation;" and "whether or not the work is a part of the [principal's] regular business . . . [.]" Mavrikidis v. *220 Petullo, 153 N.J. 117, 132, 707 A.2d 977 (1998) (citing Restatement (Second) of Agency § 220(2) (1958)).
In this case, the DEP presented evidence showing that Cherokee had some measure of control over the monitoring program pursuant to the contract. Moreover, the evidence raises an inference that Cherokee exercised that control. Cullen maintained contact with Cherokee while the monitoring program was being performed. At his deposition, Cullen testified that he spoke with a representative of Cherokee "all the time." In our view, this evidence is sufficient to raise a genuine issue of fact as to the extent to which Cherokee controlled Cullen's performance of the program.
We are also satisfied that the DEP presented sufficient evidence to support a claim against Cherokee on the ground that Cullen was not competent to perform the work he was hired to perform. Liability can be imposed on this basis if it is established "(1) that the contractor was incompetent or unskilled to perform the job for which he was hired[;] and (2) that the principal knew or had reason to know of the contractor's incompetence." Id. at 137, 707 A.2d 977.
Here, the DEP's evidence indicates that Cullen had no prior experience monitoring endangered bald eagles, and he had no education or experience in wildlife ecology. According to the DEP, Cullen's only experience was with "bird abatement," which involves the use of falcons or raptors to chase other birds away, and "hacking," which involves the release of birds into the environment. The DEP additionally notes that Cullen has been convicted of violating the laws of the United States and Australia involving migratory birds and/or endangered species. This evidence raises a genuine issue of material fact as to whether Cherokee retained a contractor who was not competent to perform the work.
We are convinced, however, that liability may not be imposed on Cherokee on the ground that the monitoring program constituted a nuisance per se. Work is considered to be a nuisance per se if it is "inherently dangerous." Id. at 143, 707 A.2d 977. This means that the work is "`an activity which can be carried on safely only by the exercise of special skill and care, and which involves grave risk of danger to persons or property if negligently done.'" Ibid. (quoting Majestic, supra, 30 N.J. at 440, 153 A.2d 321). The nuisance per se doctrine has not been extended to wildlife and the DEP has cited no authority to extend the doctrine in that manner.
We therefore conclude that the trial court erred by granting Cherokee's motion for summary judgment on the DEP's claim for vicarious liability. There are genuine issues of fact that are material to this claim. For the same reason, we conclude that the DEP was not entitled to summary judgment on its claim against Cherokee.

VII.
Finally, the DEP contends that the trial court erred by denying its motion for an adverse spoliation inference because defendants failed to preserve Mohin's daily log sheets. We do not agree.
Spoliation is the concealment or destruction of evidence relevant to litigation. Rosenblit v. Zimmerman, 166 N.J. 391, 400-01, 766 A.2d 749 (2001). The duty to preserve evidence arises when there is pending or likely litigation and knowledge of this fact by the alleged spoliating party, the evidence is relevant to the litigation, and the opposing party would be prejudiced by the destruction or disposal of the evidence. Aetna Life and Cas. Co. v. Imet Mason Contractors, 309 N.J.Super. *221 358, 366, 707 A.2d 180 (App.Div.1998). Where the duty to preserve evidence is violated, the party is responsible regardless of whether the spoliation occurred intentionally or negligently. Id. at 368, 707 A.2d 180.
Depending upon the circumstances, spoliation can result in an adverse inference against the party that caused the loss of evidence. Rosenblit, supra, 166 N.J. at 401, 766 A.2d 749. The adverse inference is a means to even the playing field between the litigants. Ibid. The inference permits the fact finder to presume that the evidence concealed or destroyed would have been unfavorable to the spoliator. Id. at 401-02, 766 A.2d 749.
At the hearing on the DEP's motion, Mohin testified that in his log sheets, he noted his observation points on the mainland and the movements of the eagles but did not record his observation points on the island. Mohin also said that he noted the activities of the eagles, as well as their dates and time. Christopher Nagy (Nagy), who Cullen hired to put Mohin's data into a computer format, testified that he created a map indicating the observation points, based on the data recorded by Mohin and Cullen.
In addition, Cullen testified that there were about ninety pages of logs, ten to twelve of which Cullen personally recorded. According to Cullen, the entries in the books reflected the times, dates and duration of the observations. Cullen took possession of the logs at the end of the project, and brought them to a meeting with Cherokee representatives in June 2004. Cullen claimed that he brought the log books with him to another meeting with both Cherokee and DEP representatives on July 15, 2004. He said that neither Cherokee nor the DEP asked him then or subsequently for the log books.
Cullen further testified that it was his practice to destroy his field notes after the final summary report was completed. He claimed that he went through every notation in the log books when he prepared his report, and everything in the log books was either in the report or reflected in the accompanying maps prepared by Nagy. Cullen denied trying to omit, destroy or hide any information from the DEP or Cherokee. Cullen said that the last time he recalled seeing the log books was sometime in July 2004.
Cullen received a notice of violation from the DEP in October 2004; however, the DEP made its first request for the log books in February 2007. Cullen's wife testified that Cullen asked her for help looking for the books sometime after the winter of 2005-2006 when they renovated their home office. She said that a lot of material was thrown out at that time. She believed the log books were inadvertently discarded during the renovation.
The trial court found that Cullen did not intentionally destroy the evidence. The record supports that finding. Cullen's wife testified that the records were probably discarded when the Cullen home was renovated. Moreover, at that time, there was no outstanding demand for the records.
The trial court additionally found that the DEP was not prejudiced by the failure to preserve this evidence. The record also supports that finding. As we have explained, the key questions pertaining to the DEP's claims are where Mohin made his observations and what effect, if any, did the monitoring have on the eagles. The DEP failed to show that the log books contained any material evidence on those issues that is not otherwise included in Cullen's final report or on Nagy's maps.
We are therefore satisfied that the trial court correctly determined that the DEP *222 was not entitled to an adverse inference against Cullen or the other defendants based on the failure to preserve the log books.
Affirmed in part, reversed in part, and remanded to the trial court for further proceedings in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] A "brownfield site is "any former or current commercial or industrial site that is currently vacant or underutilized and on which there has been, or there is suspected to have been, a discharge of a contaminant[.]" N.J.S.A. 58:10B-1.
[2] The bald eagle is no longer considered an endangered species under federal law. 72 Fed.Reg. 37, 346 (July 9, 2007).